Filed 6/13/13

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,                                    )
                                               )
      Plaintiff and Respondent,      )
                                               )        S073597
      v.                             )
                                               )
JUAN MANUEL LOPEZ,                             )
                                               )      Los Angeles County
      Defendant and Appellant.       )   Super. Ct. No. PA023649
_____)

An information filed in February 1997 charged defendant Juan Manuel Lopez and his brother Ricardo Lopez with the April 1996 murder of Melinda Carmody (Pen. Code, § 187)[1] and four other counts: kidnapping (§ 207, subd. (a)), assault by means of force likely to produce great bodily injury and/or with a deadly weapon (§ 245, subd. (a)(1)), first degree residential burglary (§ 459), and second degree burglary of a vehicle (§ 459). The information also alleged a special circumstance that the murder was committed for the purpose of preventing the victim's testimony in a criminal proceeding and that a principal was armed with a firearm in the commission of the offense. (§§ 190.2, subd. (a)(10), former 12022, subd. (a)(1), as amended by Stats. 1995, ch. 377, § 8, p. 1948.)[2]

---

[1] Hereafter, undesignated statutory references are to the Penal Code.

[2] Defendant was jointly tried before a single jury with his brother Ricardo who was the actual shooter. Ricardo was convicted of murder and the witness-murder special circumstance was found true as to him. Because Ricardo was

*(footnote continued on next page)*

A jury convicted defendant of murder and found true the special circumstance and weapon allegations. The jury also convicted defendant of all charged crimes except the vehicle burglary count, as to which it was unable to reach a decision. The jury then returned a verdict of death, which the trial court declined to modify. This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment.

## I. FACTS

### A. Guilt Phase

#### 1. Prosecution evidence

In 1995, defendant was the leader of the Parthenia Street gang. In March 1995, when she was 14 years old, Melinda "Mindy" Carmody was "jumped into" the Baby Locas — the female adjunct of defendant's gang.[3] One of the girls who initiated her into the gang was the leader of the Baby Locas, Sandra Ramirez, who became Mindy's friend. Mindy's gang moniker was "Crazy" and Ramirez's was "Shy Girl." Shortly after she joined the gang, Mindy began a relationship with defendant. She eventually ran away from home and moved in with defendant's family. In September 1995, Mindy returned home but continued her relationship with defendant.

_____

*(footnote continued from previous page)*

under the age of 18 at the time of the crime, the prosecution did not seek the death penalty against him and he was sentenced to life in prison without the possibility of parole.

[3] To join a gang, the novice gang member is set upon by several members of the gang and has to fight them off; this is called being "jumped in." Mindy had to fight with three members of the Baby Locas in order to join the gang.

Mindy broke up with defendant in February 1996. According to Mindy's preliminary hearing testimony, defendant called her at her mother's home on the morning of March 13, 1996, and asked if he could come by to pick up some papers. Mindy said no, because she was afraid of defendant. While they were still dating, defendant had told her that if she ever broke up with him, he would kill her.

About an hour after he called, defendant entered Mindy's house through the garage. He asked her if she wanted to leave with him. When she said no, defendant approached her with a knife. He stabbed her with the knife in the back of the neck and she fell onto the couch. Defendant started choking her. While he was choking her, he told her that if he "can't have [her], no one can." She fell off the couch and he released her, then he pulled her to her feet by her hair and forced her upstairs to her bedroom. Defendant put Mindy in her closet and grabbed a bag and told her to get some clothes because they were leaving. After packing the bag he pulled her downstairs. Outside of the house, he placed her into the backseat of a waiting car. Another man Mindy had never seen before was in the driver's seat. Before they left, defendant told her to change her shirt because there was blood on it.

At the preliminary hearing Mindy testified further that they drove first to defendant's house where Mindy waited in the car while defendant went inside to retrieve a bag. They then went to the house of defendant's aunt, Maria Hernandez, and defendant left her there. Hernandez helped clean the back of Mindy's neck, which was bleeding, and she changed her shirt again. Mindy remained at Hernandez's house for four hours but was unable to communicate with her because Hernandez spoke Spanish and Mindy did not. Eventually, Hernandez drove Mindy home.

Later that same day, about 5:00 p.m., Los Angeles Police Officer Robert Denton responded to a call to Mindy's home. According to the officer, Mindy was upset and nervous and started crying while he was talking to her. He took her to the police station. Photographs taken at the station showed fingerprint bruising and scratch marks around Mindy's throat and a wound to the back of her neck that had been oozing blood since Officer Denton first saw it.

Police arrested defendant on the night of the incident when, responding to a report of a car break-in at a condominium complex near where Mindy lived, they found him in a dirt area beneath a balcony. Defendant told the arresting officers that he "didn't do anything," but "was in the area to see his girlfriend." He kept repeating that he "loved her too much."

Detective Morritt interrogated defendant. After waiving his *Miranda* rights (*Miranda v. Arizona* (1966) 384 U.S. 436), defendant told Morritt that Mindy had given him permission to come to her house to pick up some papers. Defendant said he took a bus to Mindy's house and, once there, they argued and he hit and choked her. Nonetheless, according to defendant, Mindy voluntarily went with him to his house. From there, a friend drove them to the home of defendant's aunt.

Sometime after his arrest, defendant telephoned Sandra Ramirez, the leader of the Baby Locas, telling her that he had stabbed Mindy in the neck and kidnapped her. He also told her that he wanted to take Mindy to Mexico to marry her.

Mindy testified against defendant at the preliminary hearing on the kidnapping and assault charges on March 28, 1996. According to Detective Morritt, Mindy appeared frightened and upset, and cried at times during her testimony. At one point during Mindy's testimony, defendant sat forward in his chair and said, "I don't have to sit here and listen to this shit."

4

Defendant called Ramirez on March 26 and March 27, 1996, from the cell area at the court where his preliminary hearing was held.  In the first call, he again admitted to Ramirez that he had stabbed and kidnapped Mindy.  He told Ramirez to tell Mindy not to go to court.  In the second call, he asked Ramirez to come to court and pick up a letter that he had written to Mindy and deliver it to her.

Defendant was held to answer on the kidnapping and assault charges on March 28, 1996.  Defendant's sister, Patricia (Patty), told police that defendant called her during the first week of April and asked her to set up a three-way call with their brother, Ricardo, also known by his gang name "Diablo," and Jorge Uribe, a gang member who was known as "Pelon."  Patty set up the call but did not listen to the conversation.[4]

On April 11, defendant again called Ramirez while she was talking to Alma Cruz, another member of the Baby Locas.  Ramirez, Cruz, and defendant all spoke together on a three-way call.  Defendant told them they had to go to a gang meeting that was scheduled for the following night to discuss paying dues to the Mexican Mafia.  They also talked about the girls' plan to jump in a new member, a girl called "Happy," who was Mindy's friend.  The plan was to jump Happy in at a park outside the gang's territory.  Defendant insisted, however, that the girls jump her in at an alley claimed by the gang.  Defendant explained that if Happy was jumped in at the park she would not be from the gang-controlled neighborhood.  Ramirez did not believe it mattered where the new gang member was jumped in,

---

[4]     After Ricardo was arrested he made a statement to police that was introduced into evidence against him at his joint trial with defendant after it had been redacted to omit any reference to defendant.  Ricardo told police he and Uribe discussed killing Mindy before the murder and that Uribe gave him the gun he used.

5

but because defendant was the gang leader she agreed. According to Cruz, defendant asked her "if [she] could kill one of [her] homegirls." Cruz replied that it depended on whether "[the homegirl] would do something to me." Defendant said, "I already have someone doing it for me."

Records showed that on April 10, the day before defendant's conversation with Ramirez and Cruz, there were a number of phone calls from defendant's cellblock in the jail to the Lopez residence where his brother Ricardo lived with their parents. On April 11, the same day defendant spoke to Ramirez and Cruz, calls were made from the superior court cell area at Van Nuys, where defendant was arraigned, again to the Lopez residence. Three calls were also made the following day, April 12, the day Mindy was killed, from where defendant was being held in custody, to the Lopez residence.

On Friday, April 12, 1996, Baby Locas leader Ramirez drove various members of the gang, including Mindy, to an alley off Schoenborn Street to attend the gang meeting and to initiate Happy into the Baby Locas. When they arrived, the sole male gang members present were Ricardo and Uribe. According to Ramirez, Mindy seemed frightened by Ricardo's presence, but Ramirez told her not to worry because he "wasn't going to do nothing." Ricardo was drinking beer, as were other gang members including Mindy and Ramirez. Ricardo, Uribe, and other male gang members were on one side of the street and the females were on the opposite side.

At some point, Ramirez went to talk to Ricardo, who was standing with Uribe. Ricardo asked, "Why did you bring them?" and told her "[Y]ou know what's going to happen." According to Ramirez, she did not know what he meant by that, nor what he meant when he also told her that, "if anything happened, to say it was a drive by." Ricardo then took a gun out of his waistband, pointed it at

6

Ramirez and said he was going to shoot her. Ricardo put the gun away and Ramirez walked away.

Uribe crossed the street and told Mindy that Ricardo wanted to talk to her. Mindy made a face as if she did not want to speak to him, but she went. Ramirez noticed that Mindy was talking to Ricardo. She saw his gun at the side of his leg and then she heard Mindy scream, "Shy Girl, let's get out of here." She looked and saw Mindy coming toward her quickly with Ricardo following her. He was pointing his gun at Mindy and then he started shooting. Ramirez heard approximately five shots. Mindy fell into the street. Ricardo walked up to her and shot her while she was on the ground. One of the girls present heard Ricardo say something about his brother.

After Ricardo shot Mindy, he walked away with the gun to his own head.

Ramirez and the other girls ran to Mindy and tried to move her, but ultimately left her at the scene because they were afraid to say anything to the police. The girls got into Ramirez's car and drove to a convenience store where one of them called 911.

Meanwhile, Leticia Corona, who lived on Schoenborn Street, was returning home around 9:00 p.m. when she saw Mindy lying in the street. She and her sister got out of the car to help. There was a pool of blood beneath Mindy's head but she was still alive. Although her eyes remained closed, she tried to lift herself off the road. Eventually, the paramedics arrived. The next morning Corona returned to the scene and found a smashed-up bullet near the gutter. She gave it to police who later matched it to a gun taken from the Lopez residence.

A Los Angeles firefighter-paramedic transported Mindy to a nearby hospital. He and the hospital chaplain testified that Mindy's pager had a message that read "187" and a phone number later identified as belonging to Mindy's

mother. Mindy died at the hospital several hours after her arrival. The cause of death was multiple gunshot wounds.

On April 13, 1996, the day after the shooting, defendant called Sandra Ramirez and asked, "What happened?" She told him that Ricardo had shot Mindy. Defendant asked Ramirez if she knew where Ricardo was and hung up after she told him she did not. Later that day, Ricardo called Ramirez and told her to say that Mindy's killing was a drive-by shooting. Defendant then called Ramirez a second time and asked if she had spoken to police. When she said no, he told her, "Don't say anything." Ricardo then called Ramirez again, this time telling her to tell the "girls" to attend a meeting that night so they would know what to say about the shooting. According to Ramirez, when she told him she could not go, he told her that "if [she and other Baby Locas] didn't go [to the meeting], the same thing [as had happened to Mindy] was going to happen to us."

Phone and inmate locator records for that day show four calls were made to the Lopez residence from where defendant was being held in custody.

Detective Oppelt interviewed defendant 12 days after the shooting. Defendant denied having anything to do with Mindy's death and said that he had learned of it only one week earlier when the lawyer representing him on the kidnapping and assault case mentioned it to him. He said he was both mad and sad at things Mindy testified to at the preliminary hearing. He also told the detective he was depressed about her death. Defendant volunteered that Mindy told him that she had been receiving the number 187 on her pager and that he had assured her the message was not from anyone in his family.

Defendant asserted that since his arrest on the assault and kidnapping charges he had not spoken to his brother Ricardo and he also denied having spoken to Jorge Uribe. He also initially claimed not to have spoken to Sandra

Ramirez but then acknowledged that he had talked to her about jumping a girl into the gang.

In January 1997, before the preliminary hearing in the present case, Sandra Ramirez's boyfriend received a letter from Ricardo sent from a jail facility. The letter instructed him to tell Ramirez "not to go to court or else" Ricardo would "have the homeboys take care of her."

### 2. *Defense evidence*

Defendant presented the testimony of his mother, aunt, and his aunt's husband. They each testified that they saw Mindy on the day she was allegedly kidnapped by defendant and that she did not appear to be frightened, nor was she injured. Defendant's mother testified further that defendant and Mindy wanted to go to Mexico to get married. His aunt testified that she talked them out of this plan. Defendant's uncle testified that he, not his wife, drove defendant and Mindy from his house to Mindy's neighborhood. He also testified that Mindy did not appear frightened or injured.

In his defense, Ricardo introduced a portion of Ramon Ramos's preliminary hearing testimony after Ramos refused to testify. Ramos, whose gang moniker was "Oso," testified that Ricardo was drinking beer before he shot Mindy and that after he shot her, he put the gun to his own head and clicked it. He also testified that after he took the gun from Ricardo, Ricardo said, "It's for my *carnal*," meaning his brother, defendant.

### 3. *Prosecution rebuttal evidence*

The prosecution presented Mindy's diary entry for the day of the assault in which she had written that "Bird [defendant] broke in and stabbed me and choked me and kidnapped me. Went to Police station, went to Grandma's." She also told one of her schoolteachers about the incident.

9

**B. Penalty Phase Evidence**

*1. Prosecution evidence*

The prosecution presented evidence of defendant's violent acts while in custody. Sheriff's Deputies Romo and Perez testified that defendant had been injured in a fight with another inmate. After defendant had been treated in the jail infirmary, Perez prepared to use some handcuffs to transport him to the disciplinary building. Defendant said, "Fuck you, I ain't going to the hole," and tried to elbow and punch Perez in the face. In the ensuing struggle, the deputy suffered scratches, swelling and bruising. Several deputies eventually subdued defendant.

The prosecution also presented victim impact testimony from Mindy's stepmother, her grandmother, and her mother. Each testified that she had had a close relationship with Mindy and that Mindy's death had been devastating to her.

*2. Defense evidence*

Defendant declined to present a penalty phase case.

## II. DISCUSSION

**A. Jury Selection Issues**

*1. Limitation on voir dire*

The juror questionnaire in this case included four questions that touched on racial or ethnic bias — defendant is Hispanic and Mindy was Caucasian — including a question that asked prospective jurors whether they believed there was racial discrimination against Latinos in Southern California. (Question No. 86.) Prior to voir dire, the court indicated it would not ask followup questions of those jurors who did not respond to this question. Both defendants objected. On appeal, defendant contends the court abused its discretion by failing to ask such followup questions. We conclude otherwise.

10

## a. Background

At the time of defendant's trial, the trial court alone conducted voir dire. (See Code Civ. Proc., former § 223, added by Prop. 115, § 7, approved by the electorate effective June 6, 1990 [voir dire from counsel permitted only for "good cause"].) Nonetheless, prior to voir dire, the court and counsel collaborated on the juror questionnaire.

Four questions on the questionnaire addressed the issue of racial or ethnic bias. Question No. 86 stated: "If you believe that there is racial discrimination against Latino/Mexican-Americans in Southern California, please describe the problem as you see it." Question No. 82 informed prospective jurors that they were to use "the same standards (which will be given to you by the court) to judge all witnesses' credibility regardless of their occupation, lifestyle, race, ethnic background, language, sex, or sexual orientation. If you do not believe you can do this, or if you believe it would be difficult for you to do so, please set forth your thoughts about this." Question No. 87 asked prospective jurors: "Have you ever been afraid of another person because of their race," and, if so, "what was the circumstance?" Question No. 88 asked: "Are you a member of any private club, civic, professional or fraternal organization which limits its membership on the basis of race, ethnic origin, sex or religious convictions," and, if so, "please identify the club(s) or organization(s)."

Before the first group of prospective jurors entered the courtroom, the trial court made the following statement with respect to question No. 86: "I noticed in reading the questionnaires, as I'm confident you did as well, that a number of people did not respond to the question about racial prejudice. I don't have any intention of following up on that question, ladies and gentlemen . . . . In some of those responses, some showed a great sensitivity to the question, others showed less than great sensitivity to the question. For other people it was apparently

11

something they had a ready answer to, and that suggests perhaps something about them one way or the other as any person would choose to infer; but inasmuch as the non-Hispanic who is part of the information before the court goes, that is, the alleged victim, she is the only non-Hispanic, I believe, with respect to the charges themselves, and there does not seem to have been any kind of discriminatory prosecution here. I mean it's a simple and regular charging; and so if those people did not answer that, I do not intend to go over that subject matter.[5]" Ricardo's counsel objected "on behalf of my client, reserving any possible appeal rights, both on federal and state constitutional grounds." Defendant's counsel joined "for the same purpose."[6]

### b. Discussion

"At the time of trial in this matter, Code of Civil Procedure section 223, enacted by Proposition 115 (approved by the electorate effective June 6, 1990), provided for court-conducted examination of prospective jurors in a criminal case,

---

[5] The trial court's comment about discriminatory prosecution is irrelevant to the issue of whether additional questions to question No. 86 were required to probe the issue of possible racial or ethnic bias on the part of the prospective jurors.

[6] The Attorney General contends this objection was insufficient to preserve the present claim on appeal because defense counsel failed to specify the precise state and federal constitutional grounds that were the basis of his objection. We disagree. In contrast to *People v. Staten* (2000) 24 Cal.4th 434, cited by the Attorney General, in which the defendant failed to request further questions regarding racial bias in addition to those on the questionnaire that defense counsel helped draft, defendant did object to the court's explicit decision not to ask followup racial bias questions. Moreover, although unspecified, the objection was on constitutional grounds. We conclude that the objection was sufficient to preserve the issue on appeal. (See *People v. Partida* (2005) 37 Cal.4th 428, 436-437.)

12

including death penalty cases, in the presence of the other jurors." (*People v. Avila* (2006) 38 Cal.4th 491, 534.) "An appellate court applies the abuse of discretion standard of review to a trial court's conduct of the voir dire of prospective jurors." (*People v. Benavides* (2005) 35 Cal.4th 69, 88.)

"Where the jury in its discretion is responsible for determining whether a defendant *lives or dies*, the need for juror impartiality is obviously most acute." (*People v. Williams* (1989) 48 Cal.3d 1112, 1131, original italics.) Given the gravity of the stakes in a capital case, the United States Supreme Court has held that "a capital defendant accused of an interracial crime is entitled to have prospective jurors . . . questioned on the issue of racial bias." (*Turner v. Murray* (1986) 476 U.S. 28, 36-37.) Mindful of these admonitions, we nonetheless conclude that the trial court did not abuse its discretion in this case by declining to question prospective jurors who left blank question No. 86 regarding potential racial bias.

Unlike decisions cited by defendant, this is not a case in which prospective jurors were not questioned at all about potential racial bias. (See, e.g., *Turner v. Murray, supra,* 476 U.S. at pp. 36-37 [refusal of trial court to question prospective jurors about racial bias in capital case involving murder of Caucasian shopkeeper by African-American defendant]; *Ham v. South Carolina* (1973) 409 U.S. 524, 526-527 [where defendant was a young African-American civil rights worker who asserted that his prosecution for drug possession was in retaliation for his civil rights activities, the trial court's refusal to ask questions about racial bias violated the 14th Amend.].) Here, the juror questionnaire clearly addressed the issue of potential bias with four questions, including question No. 86.

Defendant also cites *People v. Holt* (1997) 15 Cal.4th 619, in support of his claim. In *Holt*, we agreed that "adequate inquiry into possible racial bias is . . . essential in a case in which an African-American defendant is charged with

13

commission of a capital crime against a White victim." (*Id.* at p. 660.) However, we went on to observe: "Unless the voir dire by a court is so inadequate that the reviewing court can say that the resulting trial was fundamentally unfair, the manner in which voir dire is conducted is not a basis for reversal." (*Id.* at p. 661.) We cannot so conclude in this case.

Here, four questions on the jury questionnaire addressed the issue of the prospective jurors' possible ethnic or racial bias. Question No. 86 inquired directly about the attitudes of prospective jurors on the issue of bias against Latinos in Southern California. As the trial court observed, the responses showed various levels of sensitivity on that issue, which presumably were useful to the parties during the selection process. Defendant claims, however, that the trial court should have questioned jurors who did not respond to that particular question because their silence may have masked bias against Hispanics. We disagree. Question No. 86 was constructed as an "if/then" question. Given that construction, a blank response indicated that the prospective juror did not believe that there existed racial discrimination against Latinos in Southern California. The trial court did not abuse its discretion by declining to inquire about every blank response to ensure that this is what the prospective juror meant. Further, to the extent a prospective juror responded to the question, as the trial court observed, the answer would stand for itself and give the parties relevant information. (Indeed, even a blank response was informative of a prospective juror's attitude on the issue.) Thus, given that "the juror questionnaire gave the prospective jurors a clear opportunity to disclose views about racial bias that would warrant their excusal from the jury" (*People v. Taylor* (2010) 48 Cal.4th 574, 609), the trial court's decision not to follow up on a question that did not require an answer and, as to which, any answer would speak for itself, fell within the appropriate exercise of its discretion.

14

Moreover, the remaining three questions that touched upon the issue of racial bias (questions Nos. 82, 87, and 88) were, unlike question No. 86, constructed in a manner that required a response from the prospective jurors. Thus, prospective jurors were required to answer whether they could apply the same standards of credibility to all witnesses despite, among other characteristics, their ethnic background; whether they had ever been afraid of a person of a different race and, if so, under what circumstances; and, whether they belonged to any organization that excluded people from membership for, among other reasons, their race or ethnic origin. Therefore, whether or not prospective jurors answered question No. 86, their answers to these other questions would have provided the parties with some insight into their attitudes about race and ethnicity.

Indeed, and notwithstanding its earlier pronouncement, the trial court asked three prospective jurors followup questions based on their answers to these questions. At the request of Ricardo's attorney, the trial court asked Prospective Juror No. 1032 question No. 83 regarding witness credibility. The trial court repeated question No. 87 to Prospective Juror No. 7502 regarding whether the juror had ever been afraid of another person because of race and posed a number of followup questions. Among the questions the court asked was: "Obviously the defendants who are before the court are Hispanic . . . . Is there anything in the fact that they are Hispanic that would prejudice you against the defense before you know anything about the case at all?" When the prospective juror seemed to hesitate, the court pressed, "You're confident of that?" and "Will you reflect on that and if it's problematic please let me know?" In response to the court's inquiry, Prospective Juror No. 0886 indicated that the prospective juror's affirmative answer to question No. 88 was wrong.

15

Defendant suggests the court's questions were inadequate because "[v]ery few jurors would answer these questions in such a way that they would admit to racial prejudice." As we have seen, the record does not support this assertion.

In *People v. Booker* (2011) 51 Cal.4th 141, in which the defendant was African-American and his victims were not, the defendant claimed the trial court erred by failing to question prospective jurors about racial bias. We rejected the claim, observing that "other than the bare fact of the difference between the races of defendant and the victims, nothing about the circumstances of this crime suggests race played any role." (*Id.* at p. 169.) The same is true here. (See also *People v. Roldan* (2005) 35 Cal.4th 646, 695 ["This was not a case in which racial prejudice was an obvious issue"].) In these circumstances, we find no abuse of discretion in the trial court's decision not to question prospective jurors who left blank question No. 86.[7]

Although we find no abuse of discretion here, we take this opportunity to remind trial courts in capital cases to "closely follow the language and formulae for voir dire recommended by the Judicial Council in the Standards [of Judicial Administration] to ensure that all appropriate areas of inquiry are covered in an

---

[7] As noted, defendant's specific objection was to the trial court's decision not to ask further questions of prospective jurors who chose not to respond to question No. 86. To the extent he is also arguing that all four questions on the juror questionnaire — which his counsel helped draft — were inadequate to assess racial bias, his argument is forfeited. Defendant did not ask the court to pose followup questions with respect to questions Nos. 82, 87 or 88 nor did he generally argue that the questionnaire failed to adequately assess racial bias. (See *People v. Taylor, supra,* 48 Cal.4th at pp. 607-608.) Even were this claim not forfeited, we conclude that on the record before us, voir dire on this issue, both in the form of the questionnaire and the trial court's followup questions was " ' "reasonably sufficient to test the jury for bias or partiality." ' [Citation.]" (*People v. Cleveland* (2004) 32 Cal.4th 704, 737.)

16

appropriate manner. Failure to use the recommended language may be a factor to be considered in determining whether a voir dire was adequate, but the entire voir dire must be considered in making that judgment." (*People v. Holt, supra,* 15 Cal.4th at p. 661.)[8]

### 2. *Prosecutor's exercise of peremptory challenges*

Defendant contends the trial court erroneously denied his claim under *People v. Wheeler* (1978) 22 Cal.3d 258 that the prosecutor used peremptory challenges in an allegedly impermissibly discriminatory manner.[9]

### a. *Background*

After the prosecutor used a peremptory challenge to excuse an African-American juror — after having excused another African-American juror the day before — defense counsel lodged a *Wheeler* objection. Defense counsel pointed out that, with the excusal of this prospective juror, "there appear to be . . . no other Blacks in the entire pool," and maintained that the dismissed juror "seems otherwise qualified. She has prior jury experience, including sitting on a jury on a

---

[8]    As relevant to this case, "Section 8.5(b)(18) [now redesignated as 4.30(b)(20)] of the California Standards of Judicial Administration (West's Ann. Cal. Codes, Rules (Appen.) (1996 ed.) p. 663) (Standards), suggests this inquiry: 'It may appear that one or more the parties, attorneys or witnesses come from a particular national, racial or religious group (or may have a life style different than your own). Would this in any way affect your judgment or the weight and credibility you would give to their testimony?' " (*People v. Holt, supra,* 15 Cal.4th at p. 660, fn. 13.) Unlike question No. 86 in this case, the standardized question requires prospective jurors to provide an answer.

[9]    Defendant also cites *Batson v. Kentucky* (1986) 476 U.S. 79, which is essentially *Wheeler*'s federal constitutional counterpart. Notwithstanding his failure to cite *Batson* in the trial court, "the *Wheeler* objection preserves the *Batson* claims." (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1008, fn. 9.)

murder case [and] indicated in her questionnaire she could personally impose the death penalty if it was appropriate . . . ."

The trial court rejected defendant's *Wheeler* claim, concluding that a prima facie case of discrimination had not been made with respect to the dismissed juror. The court found that the prospective juror "doesn't seem to be quite tuned in sometimes," and noted that she worked "a swing shift at night so that she's in court all day and working during the night. I noticed when she was sitting in the audience when we originally met her, [she] seemed to be behaving in a relatively unusual kind of way, leaning over her seat, not tuning in and paying attention to what we were doing. She had to leave once during the proceedings, as you may recall, and I can't say that that's what the exercise [of the peremptory challenge] was based on, but it would certainly appear to me from what she said and from the information, that might explain her . . . relatively noticeable conduct in court, that perhaps added together, that was sufficient."

Although the court did not find a prima facie case, it invited the prosecutor to state his position for the record. The prosecutor said, "I think there was quite enough evidence in the way — in the uncandid manner she answered particularly on her jury experience to justify my exercise of a peremptory." Ricardo's counsel, but not defendant's, objected to the sufficiency of the prosecutor's explanation for his exercise of his peremptory challenge. Ricardo's counsel said she disagreed that any lack of candor by the prospective juror was sufficient to justify excusal. The court replied, "If it [were] for cause, I would certainly disagree as well, but it's not for cause. It's peremptory and it is a sufficient reason."

### b. Discussion

We recently summarized the law governing defendant's claim in *People v. Clark* (2011) 52 Cal.4th 856. " ' "Under *Wheeler, supra*, 22 Cal.3d 258, '[a]

18

prosecutor's use of peremptory challenges to strike prospective jurors on the basis of group bias — that is, bias against "members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds" — violates the right of a criminal defendant to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the state Constitution. [Citations.]' [Citation.] 'Such a practice also violates the defendant's right to equal protection under the Fourteenth Amendment. [Citations.]' " ' (*People v. Taylor* (2010) 48 Cal.4th 574, 611.) [¶] In ruling on a motion challenging the exercise of peremptory strikes, the trial court follows a three-step procedure. 'First, the defendant must make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." [Citation.] Second, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the strikes. [Citations.] Third, "[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination." [Citation.]' (*Johnson v. California* [(2005)] 545 U.S. 162, 168, fn. omitted (*Johnson*).) [¶] Under *Johnson*, a defendant establishes a prima facie case 'by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred.' (*Johnson, supra*, 545 U.S. at p. 170; see also *People v. Taylor, supra*, 48 Cal.4th at p. 614.) . . . When, as here, it is unclear from the record whether the trial court employed [a former, now] disapproved-of standard, ' "we review the record independently to 'apply the high court's standard and resolve the legal question whether the record supports an inference that the prosecutor excused a juror' on a prohibited discriminatory basis." [Citations.]' [Citation.]" (*Id.* at pp. 903-904.)

19

Defendant contends the statistical disparity in the prosecutor's use of peremptory challenges in which half (two out of four) were directed at the only African-American prospective jurors raises an inference of discriminatory purpose. In an analogous factual situation we rejected a similar claim. "Bonilla relies principally on the fact that all African-Americans — two of two — were struck from the juror pool. It is true that the prosecution used peremptories to challenge both African-Americans in the pool, but 'the small absolute size of this sample makes drawing the inference of discrimination from this fact alone impossible. "[E]ven the exclusion of a single prospective juror may be the product of an improper group bias. As a practical matter, however, the challenge of one or two jurors can rarely suggest a *pattern* of impermissible exclusion." ' [Citations.]" (*People v. Bonilla* (2007) 41 Cal.4th 313, 342-343, fn. omitted.) As in *Bonilla*, the size of the sample in this case does not lend itself to an inference of discriminatory purpose.

Defendant also contends that the trial court's reference to the dismissed juror's work schedule as the potential cause of her noticeable inattentiveness relied on knowledge not in the prosecutor's possession. However, the issue is not whether the prosecutor knew the reason for the prospective juror's inattentiveness and, for purposes of our analysis, we do not consider the trial court's hypothesis regarding the reason for her inattention. Our focus is solely on the trial court's *observations* regarding the prospective juror's lack of attention, which it referred to as "unusual" and "noticeable." These observations are relevant to the question whether the record supports an inference of discriminatory excusal because they suggest a race-neutral reason for excusing the prospective juror. Defendant does not challenge the trial court's observations that the prospective juror was unusually and noticeably inattentive. The existence of such an apparent race-neutral reason further supports our conclusion that defendant has failed to raise the

20

inference that the prosecutor excused the prospective juror on the basis of her race. (See *People v. Taylor, supra*, 48 Cal.4th at p. 616 [no inference of discriminatory purpose where review of the record disclosed race-neutral reasons for excusing an Afrrican American prospective juror].)

Finally, defendant argues that the trial court should not have credited the prosecutor's proffered explanation for excusing the prospective juror — her asserted lack of candor in responding to questions about her prior jury service — and suggests that a comparative analysis also undermines the prosecutor's explanation. If, however, we determine that the trial court correctly found no prima facie case of discriminatory purpose in the prosecutor's exercise of his peremptory challenges, we need not address his proffered explanation or engage in comparative analysis. "We have found it proper for trial courts to request and consider a prosecutor's stated reasons for excusing a prospective juror even when they find no prima facie case of discrimination; indeed, we have encouraged this practice. [Citations.] However, the trial court is not *required* to do this at the first stage of a *Wheeler/Batson* analysis, and the trial court's invitation [to have done so here] did 'not convert [this] first-stage *Wheeler/Batson* case into a third-stage case.' [Citations.] [¶] Finally, because the trial court's request did not 'convert [this] first-stage *Wheeler/Batson* case into a third-stage case' [citation], we also 'decline defendant's invitation to engage in comparative juror analysis' [citation]." (*People v. Taylor, supra,* 48 Cal.4th at pp. 616-617.)

Accordingly, we conclude that the trial court correctly denied defendant's *Wheeler* motion on the ground that he failed to make a prima facie showing that the prosecutor's use of his peremptory challenge was motivated by group bias.

21

### 3.  Defendant's absence from in-chambers voir dire questioning

Defendant contends the trial court violated his statutory rights under section 977 as well as his state and federal constitutional rights to due process and a trial by jury by conducting some voir dire questioning in chambers and outside his presence.[10]  His argument is without merit.

During voir dire, the trial court said it wished to speak to some prospective jurors privately to determine if they were subject to excusal for cause.  The court indicated that it preferred to do so in chambers to avoid having to send the rest of the prospective jurors into the hallway.  The court told defense counsel:  "If your clients are willing, and if you are willing, I'll bring [the prospective jurors] in here one at a time, we'll do it on the record, and you can talk to your clients about anything you want to talk about with them in between, or whatever.  So we'll go back out [into open court], and I'll list who it is I want to talk to privately, and then I'll ask you if we can come back here or if we'll do it in the courtroom."  Both defense counsel agreed to this procedure.  The trial court returned to the courtroom, called the names of two prospective jurors, and obtained both sides' agreement that these prospective jurors could be questioned in chambers.  After questioning, the court excused one of the two prospective jurors for cause, over

---

**10**     To the extent defendant asserts constitutional claims on appeal not raised below, we entertain such claims only if "the new arguments do not invoke facts or legal standards different from those the trial court itself was asked to apply, but merely assert that the trial court's act or omission, insofar as wrong for the reasons actually presented to that court, had the additional *legal consequence* of violating the Constitution. . . .  [¶]  In [this] instance, of course, rejection, on the merits, of a claim that the trial court erred on the issue actually before that court necessarily leads to rejection of the newly applied constitutional 'gloss' as well.  No separate constitutional discussion is required in such cases, and we therefore provide none."  (*People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17; see *People v. Partida supra,* 37 Cal.4th at pp. 433-439.)

defendant's objection. The prosecution eventually exercised a peremptory challenge against the remaining prospective juror.

The following day the court followed the same procedure with two other prospective jurors. The parties stipulated to the excusal of one of these jurors because of his wife's medical condition. Defendant eventually exercised a peremptory challenge against the other juror.

The trial court also employed this procedure during the selection of alternate jurors, questioning five prospective jurors in chambers. One of those questioned was excused for cause because of her language difficulties.

" '[A] criminal defendant has a right to be personally present at certain pretrial proceedings and at trial under various provisions of law, including the confrontation clause of the Sixth Amendment to the United States Constitution, the due process clause of the Fourteenth Amendment to the United States Constitution, section 15 of article I of the California Constitution, and sections 977 and 1043. [Citation.]' [Citation.] The right is not absolute, however. Under federal constitutional principles, a defendant is entitled to be present at a certain proceeding only if his or her appearance 'is necessary to prevent "interference with [his] opportunity for effective cross-examination" ' or if the proceeding represents a ' "stage . . . that is critical to [the] outcome" and "his presence would contribute to the fairness of the procedure." [Citation.]' [Citation.] Our state Constitution's right to personal presence is circumscribed in a similar manner, as are sections 977 and 1043, which codify that right. [Citations.]" (*People v. Clark, supra,* 52 Cal.4th at pp. 1003-1004, fn. omitted.)[11] "This court has made it clear

_____

[11] Under section 977 a felony defendant must be personally present at certain specified portions of trial, such as arraignment and imposition of sentence, and "at all other proceedings unless he or she shall, with leave of court, execute in open

*(footnote continued on next page)*

23

that neither the state nor the federal Constitution, nor the statutory requirement that a defendant be present at 'all . . . proceedings' (§ 977, subd (b)(1)), provides a criminal defendant with the right to be personally present in chambers or at bench discussions outside the jury's presence on questions of law or other matters as to which his presence bears no reasonable, substantial relation to his opportunity to defend the charges against him." (*People v. Harris* (2008) 43 Cal.4th 1269, 1306, fn. omitted.)

In circumstances analogous to this case, we have rejected the claim that a defendant's absence from sidebar or chambers conferences during which prospective jurors were questioned violated the defendant's right to be present. For instance, in *People v. Ochoa* (2001) 26 Cal.4th 398, the trial court questioned two prospective jurors during sidebar conferences at which the defendant's counsel was present but the defendant was not. We rejected his claim that his absence from these conferences deprived him of his right to be present at trial. We observed: "Defendant has not indicated any way in which his presence at the sidebar conferences bore a reasonably substantial relation to his opportunity to defend himself. He admits the impossibility of knowing what sudden impressions and unaccountable prejudices he might have formed. Because there must be a 'reasonably substantial relation' to defendant's ability to defend himself, and not a mere 'shadow' benefit, we must reject such claims based on undue speculation. [Citations.]" (*Id.* at p. 433.)

---

*(footnote continued from previous page)*

court, a written waiver of his or her right to be personally present . . . ." (§ 977, subd. (b)(1).) Section 1043 requires that a felony defendant "be personally present at the trial." (§ 1043, subd. (a).)

24

In this case, defendant asserts that his exclusion from these conferences "made it impossible for [him] to assist his counsel when jurors were challenged and excused," but he fails to offer any specific explanation how his absence inhibited his ability to defend himself. Defendant also suggests that because he remained in the courtroom with the rest of the jury panel, the "prospective jurors were left with the impression that [defendant] was either too dangerous to participate in the proceedings in chambers or not interested in doing so." This assertion is unsupported by the record and, in any event, irrelevant to the claim he is making, which is that his exclusion from sidebar conferences made it impossible for him to have assisted defense counsel regarding juror selection. We reject defendant's claim.

## B. Evidentiary Claims

### 1. *Admission of three-way call evidence*

Defendant contends that admission of evidence that he, his brother Ricardo, and another gang member were on a three-way telephone call before Mindy's murder violated a stipulation entered into by the parties to exclude reference to that call. Alternately, he contends the evidence was either irrelevant or, if relevant, more prejudicial than probative. We reject these claims.

### a. *Background*

After defendant's brother Ricardo was arrested he was interrogated by police. During the interrogation, he revealed that he, defendant, and Jorge Uribe (also known as Pelon) had a three-way telephone conversation initiated by defendant, who was then in custody on the kidnapping and assault charges involving Mindy. Ricardo told police that in the course of that conversation, defendant made statements implicating himself in the plan to murder Mindy.

Defendant brought a pretrial motion to sever his case from Ricardo's based solely on his concern that introduction of Ricardo's statement to police would violate defendant's confrontation rights because neither Ricardo nor Uribe would be testifying at the joint trial.

This type of motion is commonly known as an *Aranda/Bruton* motion after *People v. Aranda* (1965) 63 Cal.2d 518 and *Bruton v. United States* (1968) 391 U.S. 123. The *Aranda/Bruton* rule "declares that a nontestifying codefendant's extrajudicial self-incriminating statement that inculpates the other defendant is generally unreliable and hence inadmissible as violative of that defendant's right of confrontation and cross-examination, even if a limiting instruction is given." (*People v. Anderson* (1987) 43 Cal.3d 1104, 1120.) As defendant acknowledged in his motion, as an alternative to severance, Ricardo's statement to police would be admissible against Ricardo if it was redacted to omit any portion that incriminated defendant. For this proposition he cited *Richardson v. Marsh* (1987) 481 U.S. 200 (*Richardson*). In *Richardson*, the United States Supreme Court held "the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." (*Id.* at p. 211.)

At the hearing on defendant's motion, the prosecutor informed the court that to avoid severance he intended to confer with defense counsel to reach an agreement regarding Ricardo's statement. At the next pretrial conference, the prosecutor read into the record the agreed-upon stipulation: "[O]ur agreement is that any reference to [defendant], anything that he said, the fact that he was involved in any conversations with Mr. Ricardo Lopez, the fact that there were even three-way [telephone] conversations [between defendant, Ricardo and Uribe], which would indicate that this was a missing third party there, those will

26

be deleted.  Our agreement is, however, that any references to those conversations, since they were three-party conversations, will only include reference to the fact that this was a conversation between Ricardo Lopez and this person George [*sic*] Uribe, also known as Pelon, during which the murder of Miss Carmody was discussed, but there will not be any reference to the fact that this was a three-way conversation or that [defendant] was involved.  [¶]  I believe we've looked this over.  We've looked together.  We're aware of what the prevailing case law is in this area, and we believe that this is in conformance with Richardson v. Marsh."**12** Defense counsel added:  "So stipulated, with the further proviso, so I understand that [the prosecutor] will instruct his investigating officers, if they testify to any portion of Ricardo Lopez's statement, that they will not inadvertently, or otherwise, refer to those passages that have been redacted."  The prosecutor agreed to this condition and the court accepted the stipulation.

In the prosecutor's opening statement, he told the jury that he would be calling Patty Lopez, defendant's sister, to testify that in the days before Mindy's killing Patty arranged a three-way call among defendant, Ricardo and Uribe.  Defense counsel objected, arguing that evidence that Patty set up a three-way call violated the stipulation.  According to counsel, "The agreement was not only that the content of the conversation not be admissible, not be presented to the jury, but the very fact of a three-way conversation likewise [be] totally off limits."  He requested a mistrial.

---

**12**     Although the stipulation refers to three-way conversations in the plural, the only conversation at issue here is the one to which Ricardo referred in his statement to the police during which he, defendant, and Uribe discussed killing Mindy.

The prosecutor maintained that the stipulation related solely to Ricardo's statement to the police and did not preclude other, independent testimony about the existence of the three-way call. He stated that he had disclosed to defense counsel that he intended to call Patty Lopez. The court found, however, that the prosecutor's opening statement "appeared to be violative of the spirit, if not the absolute language of the stipulation," and took the mistrial motion under submission.

The next day, there was further discussion of the matter. The prosecutor insisted that the stipulation applied only to Ricardo's statement and that its sole purpose was to comply with *Richardson, supra,* 481 U.S. 200, and avoid severance.

The following day, the court reviewed the stipulation on the record and agreed with the defense that it precluded "mention of a three-way conversation." Again, however, the prosecutor argued that the stipulation covered only Ricardo's statement, adding "I would no way enter into any agreement limiting my ability to present other evidence in this case. And I did not do that, and it was never my intention to do that." The prosecutor pointed out that Patty Lopez's testimony about setting up the three-way call impeached defendant's statement to police that he had not spoken to his brother in the days before the shooting. He observed further that, unlike Ricardo, who did not plan to testify, Patty Lopez would testify and could be cross-examined, as could other witnesses who would be testifying regarding the phone records and what they showed.

At the conclusion of the hearing, the trial court denied the mistrial motion. In the court's view there was "not a meeting of minds" with regard to the stipulation and it considered any agreement to be "limited as set forth by [the prosecutor]." Defendant's counsel argued that if the content of the three-way conversation was inadmissible under the stipulation, the existence of any such call

28

would be irrelevant or lead to impermissible speculation about the content. The court disagreed, observing that the existence of the call itself had some relevance.

Defendant renewed his objection prior to Patty Lopez's testimony, making the further argument that, even if relevant, the testimony would be more prejudicial than probative. The trial court again remarked that the stipulation was not clear and overruled the objection.

When questioned about the call, Patty Lopez initially claimed a loss of memory, even when confronted with her statement to police admitting that she set up three-way calls before and after the shooting. Ultimately, she admitted she had told police she had set up a three-way call among defendant, Ricardo, and Uribe the week before the shooting. The prosecution later called Detective Michael Oppelt, who interviewed defendant after the shooting. Oppelt explained that defendant told him the last time he had spoken to Ricardo was when defendant was initially arrested on the kidnapping and assault charges several weeks before the shooting. According to the detective, defendant also said he had not spoken to Uribe after he was arrested.

### b. Discussion

Defendant contends that the admission of Patty Lopez's testimony violated the stipulation regarding the redaction of Ricardo's statement to police.

As noted, the prosecutor argued — and the trial court ultimately agreed — that the stipulation was intended solely to avoid severance of defendant's trial from Ricardo's trial by redacting Ricardo's statement to eliminate any reference to defendant pursuant to *Richardson, supra,* 481 U.S. 200. Defendant contends that the stipulation could be given effect only by interpreting it to exclude *all* references to the three-way phone conversation, including Patty Lopez's

29

testimony, and that the trial court erred by interpreting the stipulation to permit her testimony.

The trial court initially agreed that the stipulation was at first blush broad enough to lend some support to defendant's interpretation of it. After hearing the prosecutor's explanation, which evidently the court credited, the court concluded there had been no meeting of the minds between the parties. It then construed the stipulation to limit it to Ricardo's statement to the police. We conclude that the stipulation itself was broadly worded in parts and that the trial court's ultimate interpretation of it was reasonable in light of the circumstances that led the parties to agree to the stipulation and defense counsel's further proviso. The record reveals that those concerns dealt exclusively with the admissibility of Ricardo's statement to police in such a way that would not require severance. To achieve this goal, *Richardson* required the redaction of Ricardo's statement but not the preclusion of Patricia Lopez's testimony. The trial court's interpretation of the stipulation gave the parties what they had bargained for.

In the analogous case of *People v. Dyer* (1988) 45 Cal.3d 26, 54 (*Dyer*), the defendant made a motion under *People v. Beagle* (1972) 6 Cal.3d 441, 451-454, to exclude his three prior felony convictions for impeachment purposes should he testify in his defense. The prosecutor orally agreed that he would not impeach defendant with those prior convictions. Defense counsel asked whether the prosecutor also intended to refrain from asking character witnesses about the defendant's prior convictions. The prosecutor replied, " 'It would apply to that,' " and explained he would ask his witnesses not to volunteer any information about the defendant's prior convictions. (*Dyer, supra,* at p. 55.) He stated further, " 'we assent to [the defendant's] request not to bring out in any way before this jury in this [guilt] phase of the trial any evidence of any nature concerning any prior convictions suffered by the defendant in this phase of the trial.' " (*Ibid*.)

30

Later, defense counsel asked a defense witness about the defendant's reputation. The trial court interrupted the witness's testimony to confer with counsel regarding the extent of the prosecutor's stipulation. The question on which the court sought clarification was whether the prosecutor had intended by the stipulation to refrain from asking a witness who testified to the defendant's reputation for nonviolence about the prior convictions. Defense counsel argued that the stipulation barred the prosecutor from asking about the prior convictions with respect to any character evidence. The prosecutor rejected that interpretation, arguing it was never his intention to allow the defendant to present unchallenged reputation evidence " 'because then it would be basically asking me if I would let the jury hear false information about the defendant. . . . So it was never clearly stated to me [by the defense] that there was an attempt to get me to be silent when the jury gets this false notion that this defendant has been nonviolent in his past. And I would not have acceded to those things, and I don't think the Court would require me to do that.' " (*Dyer, supra,* 45 Cal.3d at p. 55.)

The trial court agreed. It found that there had been no " 'meeting of the minds' " regarding the stipulation. (*Dyer, supra,* 45 Cal.3d at p. 56.) It concluded further that the prosecutor's interpretation in the context in which the stipulation arose — the defendant's *Beagle* motion — was correct; that the prosecutor had intended to agree only that he would not raise the issue of the defendant's prior convictions through his own witnesses. "The court observed that there was no reason for the prosecutor intentionally to forgo his right to impeach defendant's character witnesses, and defense counsel never indicated that he meant to obtain from the prosecutor a waiver of his right to impeach any witness on defendant's veracity or his lack of violent propensities." (*Ibid.*)

We found the trial court's ruling to be proper. We observed that a party may seek relief from the burdensome effect of a stipulation " 'by enforcement of

31

the stipulation in a reasonable and nonburdensome way.' [Citation.] The court followed that procedure here; it did not purport to release the prosecutor from his stipulation, but merely interpreted it to reflect the probable intention of the parties." (*Dyer, supra,* 45 Cal.3d at p. 57.) We noted that the "court could have simply released the prosecutor from the stipulation," but, instead, "in effect found here that the stipulation, as interpreted by defense counsel, should not be binding." (*Ibid.*)

Although factually distinguishable, *Dyer* provides some guidance in the present case. As in *Dyer*, the trial court in the present case found there was no meeting of the minds regarding the meaning and scope of the stipulation at issue. The defense argued the purpose of the stipulation was to prohibit any evidence of the existence of the three-way call. The prosecutor argued the sole purpose of the stipulation was to comply with *Richardson* and to permit the admission of Ricardo's confession and avoid severance. The trial court concluded the prosecutor's interpretation was the more reasonable one. We agree.

Defendant's severance motion specifically referred to redaction under *Richardson* as an alternative to severance. The prosecutor's initial comments to the court indicated that he hoped to reach agreement with the defense to redact Ricardo's confession to avoid the need for severance. Additionally, when the stipulation was entered into the record the prosecutor stated that it was "in conformance with Richardson v. Marsh." These circumstances support the trial court's conclusion that the prosecutor did not intend by the stipulation to preclude evidence about the existence of the three-way call other than by Ricardo's statement to the police.

The trial court's ruling is consistent with *Richardson* itself. Under *Richardson*, a defendant's confrontation clause rights are protected at a joint trial by the redaction of any reference to the defendant in his or her codefendant's

confession even if the redacted confession incriminates the defendant when linked to other evidence introduced at trial. (*People v. Mitcham* (1992) 1 Cal.4th 1027, 1046-1047.) In accordance with this principle, compliance with *Richardson* did not require the exclusion of Patty Lopez's testimony even if that testimony, when linked to Ricardo's redacted confession, might incriminate defendant.

Defendant next contends that any ambiguity in the stipulation should be construed in his favor. He provides no decisional support for such a rule. As the stipulation was construed by the court, defendant received what he was entitled to receive under *Richardson* — the redaction of Ricardo's statement to eliminate any reference to him. As noted, *Richardson* does not require the exclusion of other evidence that, when linked with the redacted statement, might incriminate defendant. That evidence, moreover, had relevance beyond any possibly incriminatory effect when linked to Ricardo's redacted statement in that it impeached defendant's statement to police that he did not speak to Ricardo or Uribe in the days leading up to Mindy's killing.

We also reject defendant's argument that any ambiguity should be construed in his favor because the prosecutor caused the uncertainty. The record reveals that the stipulation was the fruit of negotiations between both parties. Defense counsel had an opportunity to speak up before accepting the stipulation and did, in fact, add to it his understanding that the prosecutor would instruct his police witnesses to refrain from referring to any portion of Ricardo's interview that had been redacted. We see no reason to hold any ambiguity against the prosecution. Nor are we persuaded by defendant's claim that he relied on the stipulation when he withdrew his severance motion because he believed it protected defendant's confrontation clause rights. In line with the requirements of *Richardson*, the stipulation did protect his rights, even as ultimately construed by the trial court.

33

Defendant next argues that the evidence was either irrelevant or, if relevant, that its probative value was outweighed by its prejudicial effect. (Evid. Code, § 352.) " 'Except as otherwise provided by statute, all relevant evidence is admissible.' [Citations.] 'Evidence is relevant if it tends " 'logically, naturally, and by reasonable inference' to establish material facts . . . ." ' " (*People v. Clark, supra,* 52 Cal.4th at p. 892.) "[T]he trial court has broad discretion to determine the relevance of evidence. [Citation.]" (*People v. Cash* (2002) 28 Cal.4th 703, 727.) Applying this standard, we conclude that Patty Lopez's testimony was clearly relevant both as tending to show defendant's participation in the planning of Mindy's killing and to impeach defendant's statement to police that he had not spoken to either Ricardo or Uribe after his initial arrest for the kidnapping and assault.

Nor, contrary to defendant's claim, did the trial court abuse its discretion when it denied his motion to exclude the testimony as more prejudicial than probative under Evidence Code section 352. Under this section, the court may exclude even relevant evidence if "its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) We review the trial court's rulings under this section for abuse of discretion. (*People v. Waidla* (2000) 22 Cal.4th 690, 724.) "The prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence.' . . . 'The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, "prejudicial" is not synonymous with "damaging." ' [Citation.]" (*People v. Karis* (1988) 46 Cal.3d 612, 638.) The evidence that

34

defendant participated in the three-way call with his brother and Uribe was undoubtedly damaging to him. But it was not prejudicial under Evidence Code section 352, as articulated above.

Defendant's arguments to the contrary are not persuasive. Defendant asserts that Patty Lopez's testimony was only minimally probative because defendant's denial that he had spoken to Ricardo or Uribe did not show a consciousness of guilt about anything related to the crime. Patty Lopez testified that defendant spoke to the two men responsible for Mindy's murder in the days before the shooting. Given this evidence, defendant's denial that he had spoken to Uribe or Ricardo in that time frame raised a strong inference of consciousness of guilt. Defendant asserts furthermore that the testimony was prejudicial because the jury could have inferred that defendant's conversation with Ricardo and Uribe was in furtherance of the plan to kill. Indeed, that *was* one of the purposes for which the evidence was introduced. Although the evidence arguably "prejudiced" defendant in the same way that all evidence linking him to the crime was "prejudicial," it did not prejudice him within the meaning of Evidence Code section 352. (*People v. Karis, supra,* 46 Cal.3d at p. 638.)

Defendant also argues that Patty Lopez's testimony was cumulative to other evidence that he called and spoke to a number of people while in custody. But her testimony was the only direct evidence that defendant spoke to Ricardo and Uribe in the days before the murder. The only other evidence was the Lopez family's phone records and records of defendant's location while in custody. These records established that defendant called his family's residence from custody but did not establish to whom he spoke. Patty Lopez's testimony was not cumulative of other evidence. Moreover, to the extent her testimony *was* cumulative, it weakens defendant's claim that it was prejudicial within the meaning of Evidence Code section 352. The inferences to be drawn from Patty Lopez's testimony that he

35

finds objectionable — that he planned the killing with Ricardo and Uribe — could also have been drawn from the documentary evidence cited above.

The court did not abuse its discretion when it admitted Patty Lopez's testimony.

### 2. *Ramon Ramos's preliminary hearing testimony*

Defendant contends the trial court erred when it admitted evidence against him of codefendant Ricardo's state of mind on the night of the murder. We agree with defendant but conclude that the error was harmless.

Ricardo presented the preliminary hearing testimony of Ramon Ramos in his defense after Ramos refused to testify at the trial and the trial court declared him unavailable. (Evid. Code, § 240.)[13] Ricardo's counsel requested that only certain portions of Ramos's prior testimony be read into evidence, including his statements that he and Ricardo were drinking on the night of the murder, that Ricardo and Mindy spoke to each other in loud voices, and that after Ricardo shot Mindy he put the gun to his own head. The prosecutor requested that other portions of Ramos's testimony also be read, specifically his statement that when Ricardo pointed the gun to his head, he said, "It's for my *carnal*," which meant, "It's for my brother." Defendant's counsel objected that the statement was inadmissible hearsay and improper rebuttal. The prosecutor countered that the statement "was consistent with other testimony we received from the other witnesses, and that one of the witnesses testified that she heard the word 'brother'

---

**13** Under Evidence Code section 240, subdivision (a)(6), a witness is unavailable if he or she is "[p]ersistent in refusing to testify concerning the subject matter of the declarant's statement despite having been found in contempt for refusal to testify." Ramos refused to testify despite being advised by the court that he had no right to do so. This would appear to have been the basis of the finding of unavailability even though the court declined to sanction Ramos.

when [Ricardo] was doing it." The court overruled the defense objection, concluding that the phrase did not refer to any conversation between Ricardo and defendant, but only to Ricardo's state of mind at the time of the shooting. After Ramos's testimony on this point was admitted, defendant's counsel renewed his objection and added an objection that the testimony "calls for a conclusion." The court overruled the objection.

The parties agree that the trial court admitted the statement for the nonhearsay purpose of showing Ricardo's state of mind at the time of the shooting. (Evid. Code, §§ 1250, 1251.)**14** They disagree, however, as to whether the state of mind evidence was relevant. (*People v. Bunyard* (1988) 45 Cal.3d 1189, 1204 ["[A]n out-of-court statement is not made admissible simply because its proponent states a theory of admissibility not related to the truth of the matter asserted. . . . 'The trial court must also find that the nonhearsay purpose is relevant to an issue in dispute.' "].) Defendant maintains that Ricardo's state of mind was irrelevant to any issue involving him. He contends further that the evidence was improper rebuttal because he had not placed Ricardo's state of mind at issue. The Attorney General argues that Ricardo's state of mind was relevant in that Ramos's prior testimony suggested that Ricardo's act of shooting Mindy was unplanned and unpremeditated.

---

**14** As relevant here, Evidence Code section 1251 states: "Subject to Section 1252, evidence of a statement of the declarant's state of mind . . . at a time prior to the statement is not made inadmissible . . . if: [¶] (a) The declarant is unavailable as a witness; and [¶] (b) The evidence is offered to prove such prior state of mind, . . . and the evidence is not offered to prove any fact other than such state of mind . . . ." Evidence Code section 1252 states: "Evidence of a statement is inadmissible under this article if the statement was made under circumstances such as to indicate its lack of trustworthiness."

37

There are two problems with the Attorney General's theory. The first is that the statement "It's for my *carnal*," is as consistent with an impulsive action as a planned one. The second problem is that such evidence would tend to show premeditation only if it were admitted for its truth — that Ricardo shot Mindy on behalf of, or at the behest of, his brother. We agree with defendant that the evidence was improper rebuttal because he had not placed Ricardo's state of mind at issue and to the extent the evidence was used against defendant, it was admitted in error.

We disagree, however, with defendant's further assertion that the error was prejudicial. This testimony was fleeting and — as we discuss more fully below (pt. II.C., *post*) in addressing defendant's sufficiency of the evidence claim — there was more than sufficient evidence that Ricardo committed the murder at defendant's behest. Indeed, as the Attorney General points out, the prosecution had presented testimony in its case-in-chief that when Ricardo was shooting Mindy he said something to her about his brother. On this record, we conclude that the error was harmless. (*People v. Jablonski* (2006) 37 Cal.4th 774, 820-821 [in light of overwhelming evidence of the defendant's guilt, the erroneous admission under Evidence Code section 1250 of the victim's statement that she feared the defendant was harmless under either state or federal standards of assessing prejudice].)

### 3. The 187 evidence

Over defendant's objection, the trial court admitted the testimony of two witnesses who indicated that they saw the number 187 — inferentially a reference to section 187, the murder statute — on the victim's pager after she was shot. A paramedic saw the number 187 on the pager as he transported Mindy to the hospital. The hospital chaplain also saw a series of 187's and a phone number

later identified as belonging to Mindy's mother. The pager indicated the message had been received at 8:42 p.m. The precise time of the shooting was not established, but a witness testified that it was about 9:00 p.m. when she found Mindy lying in the street, still alive. When defendant spoke to police two weeks after the shooting, he spontaneously said that Mindy told him that she had been receiving the number 187 on her pager. He assured her the message was not from anyone in his family.

Defendant contends that the 187 evidence was irrelevant and speculative or, even if relevant, its probative value was outweighed by its prejudicial effect.

We find no abuse of discretion. Evidence that a shorthand reference to the Penal Code's murder statute appeared on the victim's pager near the time she was shot tended to support the prosecution's theory that the shooting was premeditated and not the result of Ricardo's impulsive action. Defendant asserts that the evidence was speculative because the identity of the person who sent the message was not established. Although no direct evidence proved the sender's identity, the existence and timing of the message tended to raise the reasonable inference that the page was sent by defendant or at his request. Notably, during defendant's custodial interrogation, he spontaneously volunteered that Mindy had told him the number 187 had appeared on her pager. The jury reasonably could have disbelieved defendant's claim that he had learned of this from the victim herself, particularly because there was no evidence that he had spoken with Mindy in the days before her murder. Rather, the jury could have concluded that defendant offered this explanation to police preemptively before the police could confront him with the evidence that the number had been observed on her pager after she was shot. The appearance of the number 187 on the victim's pager when coupled with defendant's spontaneous attempt to deflect any responsibility for it was indisputably relevant to the issue of defendant's involvement in the shooting. Nor

39

was the probative value of the evidence outweighed by its prejudicial effect under Evidence Code section 352. It was simply not the kind of evidence that " ' " 'uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.' " ' " (*People v. Doolin* (2009) 45 Cal.4th 390, 439.) Accordingly, the trial court did not abuse its discretion in admitting the pager evidence.

### 4. *Limitations on cross-examination of Susan Carmody*

Defendant contends the trial court erroneously sustained prosecution objections to three questions that his counsel asked during cross-examination of the victim's mother, Susan Carmody. Specifically he asserts that the trial court erred when it prevented counsel from asking (1) how many times Mindy had run away from home before she moved in with defendant's family, (2) whether Mindy returned home of her own volition or because she was frightened, and (3) whether Carmody had once said that Mindy dressed "like a [W]hite girl" when she and Carmody were together but "like a chola" when they were not. (Defendant explains that "chola" is a slang word for a Latina gang member.)

The trial court did not abuse its considerable discretion in sustaining the prosecutor's objections to these questions. Carmody testified that Mindy had run away from home before she moved in with defendant's family and that at the time Mindy moved in with defendant, she was 14 or 15 years old. Carmody testified further that she did not demand that Mindy return home because she felt Mindy was safe and being cared for at the home of defendant's family.

Defendant contends that evidence regarding the number of times Mindy ran away from home was necessary because otherwise he might have been perceived as the person responsible for, or as having contributed to, the victim's problems with her mother. This is not persuasive. Testimony by a mother that her 14- or

40

15-year-old daughter had run away from home more than once before she moved in with her boyfriend's family was plainly indicative of a troubled family dynamic that predated defendant's relationship with Mindy. Indeed, Carmody's further testimony that she allowed her daughter to remain with defendant's family because Mindy was safe and being cared for would have put defendant and his family in a positive light. The exclusion of testimony regarding the number of times Mindy had run away from home was not an abuse of discretion.

Nor did the court abuse its discretion when it sustained the prosecution's objection to defense counsel's question whether the police had frightened Mindy into returning home from defendant's house. Carmody had already testified it was possible Mindy returned home because "some police officers scared her into doing so." She testified further that Mindy maintained her relationship with defendant even after she returned home. Defendant asserts the court should have allowed him further examination of Carmody concerning the circumstances under which Mindy returned home to dispel any implication that Mindy did so because she had rejected defendant. But the jury was aware that Mindy continued her relationship with defendant after she returned home and that her return home may have been the result of police intervention. The court did not err in declining to allow further questioning on this minor and peripheral point.

Finally, defendant asserts the trial court erred in prohibiting him from questioning Carmody regarding her reputed statement concerning Mindy's manner of dressing because it was relevant to explore Carmody's state of mind and her bias in this case as a result of her daughter's relationship with defendant. Defense counsel had already elicited testimony from Carmody that she was upset about Mindy's relationship with defendant and that she had chosen to live with him. Moreover, Carmody's bias would have been unmistakable to the jury, given that defendant stood accused of arranging Mindy's killing. The trial court did not

41

abuse its discretion in prohibiting a question the main point of which appeared to be to attempt to establish that Carmody was generally prejudiced against Latinos.

>    5. *Evidence of the victim's demeanor at the kidnapping preliminary hearing*

After the victim's preliminary hearing testimony was read into the record, the prosecutor questioned one of the detectives who had been present when Mindy testified, regarding Mindy's demeanor. Defendant objected that the testimony was irrelevant and speculative. The objection was overruled. The detective testified briefly that Mindy was "frightened, upset and sometimes crying," and, at one point, was given tissues by the trial judge, who asked her, " 'Would you like to go on?' "

Defendant renews his claim that testimony regarding the victim's demeanor at the preliminary hearing was irrelevant and may have led the jury to speculate that she was frightened to be giving testimony against defendant. The Attorney General asserts the evidence was relevant to the jury's assessment of Mindy's demeanor for purposes of judging her credibility at the prior hearing. (Evid. Code, § 780.) Defendant responds that such assessment must be made contemporaneously with the witness's testimony and not by secondhand evidence in the witness's absence.

Evidence Code section 780 provides in pertinent part: "Except as otherwise provided by statute, the court or jury may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony at the hearing, including but not limited to any of the following: [¶] (a) His demeanor while testifying and the manner in which he testifies." "[A] witness's 'demeanor is always relevant to credibility.' [Citations.]" (*People v. Scott* (2011) 52 Cal.4th 452, 493.) The Attorney General argues that Evidence Code section 780 does not limit demeanor evidence to the

jury's firsthand observations of the witness as he or she is testifying before the jury but, when the witness is unavailable, such evidence may be supplied by other witnesses. Defendant contends that permitting secondhand testimony regarding demeanor may violate the confrontation clause because the defendant is unable to effectively challenge such evidence.

We need not decide whether admission of this testimony was error because any error would have been harmless under any standard of prejudice. The testimony was brief and the prosecutor did not emphasize the officer's observations in his closing argument. Furthermore, the jury reasonably could have found from Mindy's preliminary hearing testimony that she was frightened by defendant. Mindy testified, for example, that she refused to allow defendant to come to her house because "I'm scared of him," and that she was frightened when defendant pushed her into his car. We conclude any error in permitting the officer to testify regarding Mind's demeanor at the preliminary hearing was harmless.

### 6. Evidence of Mindy's diary entry and her statements to one of her teachers

During the defense case, defendant's mother, aunt and uncle testified that, on the day Mindy was allegedly kidnapped and assaulted, she appeared to them to have been uninjured and unafraid and that she was with defendant of her own volition. In rebuttal, and over defendant's objection, the prosecution introduced a passage from Mindy's diary and a statement she made to one of her teachers that were consistent with her testimony at the preliminary hearing that defendant had assaulted and kidnapped her. The diary entry read: "[Defendant] broke in and stabbed me and choked me and kidnapped me. Went to Police station, went to Grandma's." Mindy's teacher testified that Mindy told him defendant had broken into her house, threatened her, held a knife to her neck and taken her to his aunt's house.

43

On appeal, defendant argues the rebuttal evidence was improperly admitted because it did not constitute a prior consistent statement and it violated his confrontation and due process rights and his right to a reliable capital trial. His argument is meritless.

Defendant's confrontation clause claim is not preserved on appeal because he did not object to the admission of the rebuttal evidence on that ground. (*People v. Riccardi* (2012) 54 Cal.4th 758, 801 & fn. 21 (*Riccardi*).) His claim, based on *Crawford v. Washington* (2004) 541 U.S. 36, also is without merit. In *Crawford*, the United States Supreme Court held that " '[t]estimonial statements of witnesses absent from trial [can be] admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine.' " (*Williams v. Illinois* (2012) ___ U.S ___ [132 S.Ct. 2221, 2232].) But neither the diary entry nor Mindy's statement can be deemed testimonial within the meaning of *Crawford*. Under the circumstances of this case, Mindy's recording of the day's events in her private diary and her disclosure of the incident to a trusted teacher, like other "informal statement[s] to a person not affiliated with law enforcement," fall outside the scope of the confrontation clause, which is concerned with "formal and solemn accusatory statements . . . in the context of criminal investigations or inquiries." (*People v. Cage* (2007) 40 Cal.4th 965, 987, italics omitted; see *id.* at pp. 986-991 [assault victim's statement to a hospital physician identifying the defendant as his assailant was nontestimonial].) Defendant's *Crawford* claim fails.

We turn now to whether this evidence was properly admitted, over defendant's objection, under the exception to the rule against admitting hearsay to prove prior consistent statements.

"To be admissible as an exception to the hearsay rule, a prior consistent statement must be offered (1) after an inconsistent statement is admitted to attack

44

the testifying witness's credibility, where the consistent statement was made before the inconsistent statement or (2) where there is an express or implied charge that the witness's testimony recently was fabricated or influenced by bias or improper motive, and the statement was made prior to the fabrication, bias, or improper motive. (Evid. Code, §§ 791, 1236.)" (*Riccardi, supra,* 54 Cal.4th at p. 802.) Here, as in *Riccardi*, we "are presented with the latter situation — an express or implied charge that [Mindy's] testimony recently had been fabricated or influenced by bias or improper motive — governed by subdivision (b) of Evidence Code section 791." (*Ibid.*)

Defendant contends this second exception is inapplicable for two reasons. First, he argues there was no suggestion in the testimony of his witnesses that Mindy had fabricated her preliminary hearing testimony, thus opening the door to rehabilitating her testimony with the admission of her diary entry and the statement to her teacher. We are not persuaded. The statute itself speaks of an "express or *implied* charge" of fabrication. (Evid. Code, § 791, subd. (b), italics added.) " '[R]ecent fabrication may be inferred when it is shown that a witness did not speak about an important matter at a time when it would have been natural for him to do so,' and in such a circumstance, 'it is generally proper to permit rehabilitation by a prior consistent statement.' [Citations.]" (*Riccardi, supra,* 54 Cal.4th at p. 803; see also *People v. Manson* (1976) 61 Cal.App.3d 102, 143.) In this case, defendant's mother and aunt were specifically asked whether Mindy told them she was being held against her will. Both said no. Additionally, defendant's aunt testified that Mindy did not complain of any injuries. Plainly, the purpose of this testimony was to imply that Mindy's preliminary hearing testimony was of recent fabrication.

Second, defendant argues that Mindy's diary entry and statement to the teacher do not qualify as prior consistent statements because they were made *after*

45

defendant's relatives had observed and spoken to her and after she had spoken to the police and accused defendant. Defendant argues "[a]t that point, she had already spoke[n] to [defendant's] relatives and any motive to fabricate the evidence was already present. Accordingly, Melinda's statements were inadmissible hearsay because they were not made before any other inconsistent statements or before she had a motive to fabricate [defendant's] guilt." We disagree.

As noted, Mindy's statements fall under subdivision (b) of Evidence Code section 791 (section 791(b).) Pursuant to section 791(b), a prior consistent statement is admissible to corroborate later testimony which is impliedly or expressly alleged to have been fabricated if the prior consistent statement was made before the motive for fabrication arose. The specific timing question in this case, then, is whether Mindy's diary entry and her statement to her teacher were made before any motive to fabricate arose. But defendant does not identify the moment at which a motive to fabricate arose before Mindy's diary entry or her statement to the teacher. Rather, although he casts his argument as a timing claim, what he is actually asserting is that Mindy's silence could not provide the predicate for the admission of these statements to support her preliminary testimony because what was at issue was not her silence, "but her positive interactions with [defendant's] family and their observations about her physical and mental state." In other words, he is simply repeating his earlier claim that the testimony of his witnesses about their interactions with, and observations of, Mindy on the day of the kidnapping did not imply that her failure to tell them about the kidnapping was inconsistent with her later preliminary hearing testimony.

As we have already explained, Mindy's silence *was* at issue. The premise of the defense was that if, as Mindy testified at the preliminary hearing, she had

been assaulted and kidnapped by defendant, she would have said something to his mother, aunt, and uncle. From the evidence she said nothing to them, the jury was invited to infer that her preliminary hearing testimony was fabricated. The use of her silence by the defense for this purpose opened the door to admission of prior statements consistent with her preliminary hearing.

It has long been recognized that when, as in this case, a witness's silence is presented as inconsistent with his or her later testimony, a statement made at the earliest opportunity after the silence that is consistent with the witness's later testimony may be admissible as a prior consistent statement under section 791(b). (*People v. Gentry* (1969) 270 Cal.App.2d 462, 474 (*Gentry*).)

In *Gentry*, the defendant presented evidence at trial that when the witness, Turner, was first questioned by police he failed to provide them with the damaging information about the defendant's involvement in the crime to which he later testified at trial. To rebut the implication that Turner's trial testimony was fabricated, the prosecution was allowed to introduce evidence of a second statement Turner made to the police the following day in which he did include the information to which he testified at trial. The Court of Appeal held the trial court properly admitted the second statement. As the court observed, at the time of Turner's initial interrogation by the police on the night of the crime he was "groggy and half asleep," having gone to sleep drunk. (*Gentry, supra,* 270 Cal.App.2d at p. 474.) But, "he made a full statement to the sheriff's officers of what he knew relevant to the case at the earliest opportunity after he had recovered his senses. The explanation was corroborated by one of the officers to whom the statement had been made and by the statement reporter who recorded the statement." (*Ibid.*)

*Gentry*'s conclusion that Turner's later statement to the police was admissible as a prior consistent statement focuses on two factors; that at the time

of his initial silence he suffered from an incapacity that prevented him from speaking and that he made the prior consistent statement at the "earliest opportunity" after the incapacity was removed. (*Gentry, supra,* 270 Cal.App.2d at p. 747.) In this case, Mindy's failure to report defendant's assault on her to his relatives can easily be explained by a concern for her safety; namely, she may not have been inclined to alert defendant's relatives to the kidnapping and assault for fear of repercussions from defendant. Once she was no longer incapacitated by fear of defendant, she recorded the incident in her diary and told her teacher about it two days later. This time frame falls within *Gentry*'s "earliest opportunity" limitation. (*Ibid*.)[15]

Accordingly, we conclude that the trial court properly admitted Mindy's diary entry and her statement to her teacher as prior consistent statements.

### C. Sufficiency of the Evidence Supporting Defendant's Conviction of First Degree Murder

The prosecution's theory of defendant's liability was that he orchestrated Mindy's murder while in custody on the assault and kidnapping case in retaliation for her preliminary hearing testimony in that case and to prevent her from testifying against him at the trial of those charges. Because defendant was not the

---

[15] Although Mindy was interviewed by the police before she made the diary entry, there was no evidence of what she told the police. The officer who spoke to her did testify that she was upset and nervous and that she wept while he was at her residence. She was then taken to the police station where her injuries were photographed. From the officer's testimony, one can surmise that Mindy was still traumatized when she spoke to the police, that is, still to some degree incapacitated by the events. Accordingly, we would not deem inadmissible her diary entry on the ground that her "earliest opportunity" to speak would have been when police interviewed her. (*People v. Gentry, supra,* 270 Cal.App.2d at p. 474.) Rather, the officer's description of her emotional state and the photographs of her physical injuries corroborate her diary entry in the same way that the officer's testimony in *Gentry* corroborated Turner's statement. (*Ibid*.)

shooter, the prosecution theorized that he was guilty of murder as an aider and abettor or a coconspirator and the jury was so instructed. Defendant contends there is insufficient evidence to support his conviction of first degree murder as an aider and abettor. We conclude that the evidence sufficed.

As we have explained, "[w]hen a defendant challenges the sufficiency of the evidence,' "[t]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence — that is, evidence which is reasonable, credible, and of solid value — such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.]' [Citations.] . . . 'Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence. [Citation.]' [Citation.] We ' " 'presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " [Citation.]' [Citation.]" (*People v. Clark, supra,* 52 Cal.4th at pp. 942-943.)

"The elements of a charge of murder are an unlawful killing with malice aforethought." (*People v. Catlin* (2001) 26 Cal.4th 81, 139.) Murder perpetuated by any kind of willful, deliberate and premeditated killing with express malice aforethought, or that is immediately preceded by lying in wait is murder in the first degree. (§ 189.) Here, the jury was instructed with both these theories of first degree murder. Defendant does not challenge the sufficiency of the evidence to prove first degree murder. His concern is with his liability for that offense.

A person may be liable for a criminal act as an aider and abettor. Section 31 defines "principals" in a crime to include persons who "aid and abet in its commission, or, . . . have advised and encouraged its commission." (§ 31.) This court has interpreted section 31 to require that an aider and abettor must act with "knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and . . . conduct by the aider and abettor that in fact

49

assists the achievement of the crime. [Citation.]" (*People v. Perez* (2005) 35 Cal.4th 1219, 1225.)

Defendant contends there was insufficient evidence that he was a principal under section 31 because there was no direct evidence that he instigated the murder or encouraged or advised its commission. His contention fails. Preliminarily, the substantial evidence rule does not require that the evidence supporting defendant's conviction be direct evidence. For purposes of the rule, substantial evidence encompasses circumstantial evidence and any reasonable inferences to be drawn from such evidence. (*People v. Clark, supra,* 52 Cal.4th at p. 943.)

There is no question that the evidence shows defendant had a strong motive for the murder: to retaliate against Mindy for testifying against him at the preliminary hearing on the assault and kidnapping case and to prevent her from testifying at trial. This was demonstrated by his call to Sandra Ramirez before the preliminary hearing in which he told Ramirez to tell Mindy not to go to court, followed by his second call to Ramirez in which he asked her to come to court and pick up a letter from him to Mindy; by the disturbance he caused at the preliminary hearing when, during Mindy's testimony, he said, "I don't have to sit here and listen to this shit"; and by his statement to police after the killing that he was angry about Mindy's testimony at the preliminary hearing. The presence of motive is a circumstance that may establish guilt. (*People v. Estep* (1996) 42 Cal.App.4th 733, 738.)

There was also strong evidence of defendant's active involvement in the murder even though he was in custody. Defendant orchestrated Mindy's presence at the alley where she was murdered by insisting that Mindy's friend "Happy" be initiated into the girls' gang in the alley rather than in the park where the girls had originally planned to jump her into the gang. Documentary evidence

50

demonstrated that one and two days before the shooting and on the day of the shooting calls were made from where defendant was being held in custody to his family's residence where his brother Ricardo lived.

Moreover, Patty Lopez, the sister of defendant and Ricardo, told police she had arranged a three-way call between defendant and Uribe — who supplied the weapon — in the days before the killing. The jury could reasonably have inferred from this evidence that the subject matter of defendant's conversation with Ricardo and Uribe was Mindy's murder. The jury could reasonably also have concluded that defendant's insistence that Mindy be brought to the alley was part of the plot. There also was defendant's question to gang member Alma Cruz the day before the shooting in which he asked her whether she could kill a "homegirl," followed by his statement, "I already have someone doing it for me." The jury reasonably could have inferred that the "homegirl" in question was Mindy.

Subsequent to the shooting, defendant acted and made statements in a manner from which the jury reasonably could have inferred consciousness of guilt that, in turn, provided additional evidence of his participation in the killing as a principal. The day after the shooting, defendant called Sandra Ramirez and asked her, "What happened?" When she told him Mindy had been killed, instead of professing shock or grief, he asked her if she knew where Ricardo was and hung up when she said she did not. In a second call later that day, defendant asked her if she had spoken to police, and advised her not to say anything to them. When interviewed by police approximately two weeks after the shooting, defendant lied when he was asked when he had learned about Mindy's killing. He told Detective Oppelt he had learned about it only one week after it had happened. Defendant also lied about not having spoken to either his brother or Uribe in the days before the shooting. Defendant also initially lied to police about whether he had spoken to Ramirez, but then admitted he had talked to her about initiating a girl into the

51

gang. This statement corroborated Ramirez's testimony that she and defendant had spoken about this matter. Around the time Mindy was shot, the number 187 was sent to her pager. Defendant spontaneously volunteered to police that Mindy had complained to him about the number appearing on her pager and he said he had told her the message was not from his family. From the fact that defendant admitted knowing about this incident and went out of his way to exculpate himself, the jury could have inferred the message originated from him or at his behest.

Viewed in the light of the substantial evidence rule, the evidence was more than sufficient for the jury to have concluded that defendant instigated Mindy's killing, assisted in its planning, and advised and encouraged his brother to carry it out and was therefore guilty of first degree murder as a principal under an aiding and abetting theory.

As noted, the prosecution alternatively argued that defendant could be convicted of Mindy's murder under a conspiracy theory. Although defendant does not specifically challenge the sufficiency of the evidence to support that theory, to the extent his argument may encompass such a claim, we reject it. "One who conspires with others to commit a felony is guilty as a principal. (§ 31.) ' "Each member of the conspiracy is liable for the acts of any of the others in carrying out the *common* purpose, i.e., all acts within the reasonable and probable consequences of the common unlawful design." [Citations.]' " (*In re Hardy* (2007) 41 Cal.4th 977, 1025-1026.)

The same evidence that supports defendant's conviction of first degree murder on an aiding and abetting theory also supports his conviction on a conspiracy theory of liability. That evidence shows defendant conspired with his brother to kill Mindy and was personally responsible for luring Mindy to the alley where she was shot to death. Additionally, defendant is liable for Mindy's murder

52

based on the acts taken by Ricardo to carry out the crime that was the object of the conspiracy.

Defendant offers alternative and innocuous explanations of the evidence that supports his conviction. Under the substantial evidence rule, however, " 'if the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding.' [Citation.] Accordingly, we need not — and do not — address all of defendant['s] assertions of conflict[] in the evidence, or [his] alternative theories regarding the inference[] that should have been drawn from the evidence." (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 162.)

We conclude that substantial evidence does establish that defendant was a principal to the crime and therefore supports his conviction of first degree murder.

## D. Claim of Prosecutorial Misconduct in Guilt Phase Closing Argument

Defendant contends the prosecutor committed misconduct during closing argument by disparaging his attorney and by arguing facts not in evidence. We reject his claim.

" 'A prosecutor's misconduct violates the Fourteenth Amendment to the United States Constitution when it "infects the trial with such unfairness as to make the conviction a denial of due process." [Citations.] In other words, the misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial." [Citation.] A prosecutor's misconduct that does not render a trial fundamentally unfair nevertheless violates California law if it involves "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." [Citations.]' [Citations.]" (*People v. Clark, supra,* 52 Cal.4th at p. 960.) "Generally, a claim of prosecutorial misconduct is preserved for appeal only if the defendant objects in the trial court *and* requests an

admonition, or if an admonition would not have cured the prejudice caused by the prosecutor's misconduct.  [Citations.]"  (*People v. Ledesma* (2006) 39 Cal.4th 641, 726, italics added.)

Defendant's first claim of prosecutorial misconduct involves statements made by the prosecutor at two points during his closing argument, which he argues disparaged defense counsel.  "Personal attacks on opposing counsel are improper and irrelevant to the issues."  (*People v. Sandoval* (1992) 4 Cal.4th 155, 184.)

Commenting on defense counsel's assertion that the prosecutor had invited the jury to base its verdict on speculation, the prosecutor suggested it was defense counsel who wanted the jury to speculate.  He added, "counsel has looked you in the eye unblinkingly and just said straight out, butter wouldn't melt in their mouths, and I want you to think about — ."  Ricardo's counsel immediately objected.  The court sustained the objection.  A few pages later in the transcript, responding to the defense argument that the prosecutor had asked the jury to speculate that it was defendant who broke into Margarite Pile's car, the prosecutor said:  "How do you know [defendant] was in the car?  Now, this is what I'm talking about.  I thought [defendant's counsel] was in the courtroom during [Pile's] testimony —."  Defense counsel objected to the "disparaging remark about counsel," and the objection was sustained.

Defendant contends the prosecutor committed reversible misconduct by attacking his attorney's integrity and implying that he was lying to the jury.  The Attorney General argues that defendant has forfeited his argument regarding the first allegedly disparaging remark because cocounsel, and not defendant's counsel, made the objection.  But the prosecutor's statement that "butter wouldn't melt in *their* mouths" appears to have been directed at both counsel.  Once cocounsel's objection was sustained, it would have served no purpose for defendant's attorney to independently object.  Under these circumstances, we find no forfeiture on the

ground that defendant's counsel failed to object. However, as noted, to preserve the issue of prosecutorial misconduct on appeal, the defendant must both object *and* request a curative admonition unless such admonition would have failed to cure to any prejudice. (*People v. Ledesma, supra*, 39 Cal.4th at p. 726.) Defendant's failure to request a curative admonition as to either of the allegedly disparaging statements forfeits the claim. (*People v. Stanley* (2006) 39 Cal.4th 913, 942 [defense counsel's failure to request admonition after objecting to prosecutor's guilt phase rebuttal argument forfeits the claim on appeal]; *People v. Montiel* (1993) 5 Cal.4th 877, 914.) In any event, the claim is meritless. The remarks in question were fleeting and rather obscure. Even if they constituted misconduct, they do not constitute the type of deceptive and reprehensible methods that require reversal. (See *People v. Sandoval, supra,* 4 Cal.4th at p. 184 [prosecutor's comments denigrating defense counsel were a small part of the prosecutor's argument and did not require reversal].) Morever, the court sustained objections to the two comments that defendant claims constitute misconduct. (*People v. Hill* (1998) 17 Cal.4th 800, 845 ["[A]s to some of Morton's acts of misconduct, Blum objected and the trial court sustained the objection, thereby diminishing the prejudice flowing from that particular misconduct"].)

Defendant's second allegation of prosecutorial misconduct asserts that the prosecutor argued facts not in evidence. "The prosecutor should not, of course, argue facts not in evidence." (*People v. Osband* (1996) 13 Cal.4th 622, 698.)

During defense counsel's own closing argument, he attacked the credibility of Mindy's fellow gang members, Sandra Ramirez and Alma Cruz, regarding their testimony that defendant had asked Cruz whether she would kill a "homegirl." In rebuttal, the prosecutor argued that, had Ramirez and Cruz wanted to falsely implicate defendant in the murder "why [didn't] they just come straight out and say it? If they really wanted to get this guy, for God knows what reason, why

55

didn't they say [defendant] said, hey, I've got Ricardo and [Uribe] working on it?"
Defendant's counsel objected that the prosecutor was arguing facts not in
evidence. The objection was overruled.

Defendant contends the prosecutor's argument was improper because it
assumed the two women knew that Ricardo and Uribe were both implicated in the
crime when the only evidence implicating Uribe was Ricardo's statement, which
was not admitted against defendant. He claims that this amounted to arguing facts
not in evidence. We disagree. The evidence showed that Uribe was with Ricardo
when Ramirez, Cruz, and the other girls arrived in the alley where Mindy was
shot. Uribe also was present when Ricardo chastised Ramirez for bringing the
other girls because "you know what's going to happen," and when he told her that
"if anything happened to say it was a drive by." Uribe was there when Ricardo
removed the gun from his waistband, pointed it at Ramirez and said he was going
to shoot her. It was Uribe who went over to Mindy and told her that Ricardo
wanted to talk to her. The prosecutor could properly invite the jury to infer that
Ramirez and Cruz surmised Uribe was part of the plan to kill the victim. (*People
v. Mitcham, supra,* 1 Cal.4th at p. 1052 [the prosecutor may argue his or her view
of the inferences to be drawn from the evidence].) Accordingly, the prosecutor's
rehabilitation of the witnesses' credibility by pointing out that, had they wanted to
implicate defendant, they could have done so more directly, was not misconduct.

**E. Claims of Guilt Phase Instructional Error**

*1. Motive instruction*

Defendant contends the standard instruction on motive given in this case
(CALJIC No. 2.51) improperly shifted the burden of proof. The jury was
instructed as follows: "Motive is not an element of the crime charged and need
not be shown. However, you may consider motive or lack of motive as a

56

circumstance in this case. Presence of motive may tend to establish a defendant is guilty. Absence of motive may tend to show that a defendant is not guilty." "[T]he instruction did not shift the burden of proof. It merely told the jury it may consider the presence or absence of motive. [Citations.] The motive instruction . . . did not undercut other instructions that correctly informed the jury that the prosecution had the burden of proving guilt beyond a reasonable doubt." (*People v. Cleveland* (2004) 32 Cal.4th 704, 750.) We decline defendant's invitation to revisit these conclusions.

### 2. *Consciousness of guilt instructions*

Defendant contends the consciousness of guilt instructions given in this case regarding false statements and suppression of evidence (CALJIC Nos. 2.03 & 2.06) were impermissibly argumentative and allowed the jury to convict him based on improper inferences. As given here, CALJIC No. 2.03 provided: "If you find before this trial a defendant made a willfully false or deliberately misleading statement concerning the crimes for which he is now being tried, you may consider such statement as a circumstance tending to prove a consciousness of guilt. However, that conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are matters for you to determine." CALJIC No. 2.06 essentially tracks CALJIC No. 2.03 with respect to the suppression of evidence "such as the intimidation of a witness and/or by concealing evidence." As defendant acknowledges, we have repeatedly rejected the same argument in other cases. (*People v. Stitely* (2005) 35 Cal.4th 514, 555 [CALJIC No. 2.03 is neither argumentative nor does it "generate an irrational inference of consciousness of guilt"]; *People v. Holloway* (2004) 33 Cal.4th 96, 142 [neither CALJIC No. 2.03 nor CALJIC No. 2.06 is argumentative or fundamentally

57

unfair].)  These conclusions apply with equal force to the case before us and defendant provides no persuasive reason for reconsidering the issue.

### F.  Penalty Phase Issues

#### 1.  Prosecutorial misconduct

Defendant contends the prosecutor committed misconduct during his closing argument in the penalty phase by (1) asserting that imposition of the death penalty on defendant was necessary to protect witnesses who had testified against him, (2) contending that the rule of law required imposition of the death penalty, and (3) contrasting defendant's life in prison with the victim's family's loss.  We find no misconduct.

We previously have set forth the applicable legal standard in our review of defendant's claims of prosecutorial misconduct at the guilt phase.  (*See ante*, pt. II.D.)  The same standard applies to asserted misconduct at the penalty phase. (*People v. Williams* (2010) 49 Cal.4th 405, 464.)

##### a.  Urging imposition of the death penalty to protect witnesses

Defendant contends that the prosecutor improperly argued that the death penalty was necessary in order to protect Mindy's fellow gang members, Sandra Ramirez and Alma Cruz.  Specifically, he cites the prosecutor's statements that defendant had subjected the witnesses to a continuing nightmare and that the jury must protect them.  Defendant contends that these remarks conveyed to the jury that the system had failed Mindy and the only way the jury could prevent defendant from posing a future danger to the witnesses was to return a death sentence.  We conclude the argument was not improper.

In the prosecutor's discussion of the circumstances of the crime as a factor in aggravation, he referred to evidence that defendant had employed other people to carry out the murder.  For example, he pointed out that that defendant got his

"own younger brother" to do the shooting. He continued, "Who else did he leave in his wake here? Look at the witnesses in this case. [¶] Look at Sandra Ramirez and Alma Cruz. Look at what position they were put in." This remark drew a defense objection on the ground of "[i]mproper argument," which was overruled. The prosecutor went on, "The circumstances surrounding this offense, he arranged through them, using them to get someone that was their friend in a position to be killed. And during that conversation what is he talking about? He's talking about the Mexican Mafia. He's talking about dues. He's talking about killing homegirls. And then afterwards they're told not to say anything. They still had enough courage to do the right thing, but it took a lot of courage. [¶] So when does their nightmare end? When do they stop looking over their shoulders?"

The prosecutor spoke again about witness killing when discussing the special circumstance that the victim was a witness to defendant's crimes and intentionally killed for that reason. He argued: "This is a horrible crime. It goes to the very heart and soul of our system, the killing of a witness, not only that, a child. Not only that, it is reached from beyond the walls of a custodial facility to the outside . . . ." Continuing in this vein, the prosecutor explained that killing a witness was a special circumstance on par with "torture" and "multiple murders" warranting the "ultimate penalty" because "things like the murder of a witness, of a juror, of a judge . . . go right to the very core of our system, that system that we rely upon that allows the families and allows people to put trust in this system that says yes, we can approximate justice . . . ."

The prosecutor returned to the theme of witness killing after a recess. He pointed out that "[t]he system can't function if people are killed and cannot testify, or if they testify and then are killed and not able to answer the lies that are presented. The system cannot function if people are too afraid to come to court and tell the truth and to do the right thing." Referring to Mindy, he noted, "She

59

said she was afraid of this man. She still testified, and when she testified, what is she looking for? The protection of this system. And we didn't protect. She's dead now." Referring to the witnesses in this case, including Sandra Ramirez, who "have courage to try and do the right thing," the prosecutor asked the jury to "think about what trust these witnesses . . . place in us." He told the jury, "make sure that, through your search of justice and through your looking at what is the appropriate penalty, that that trust is not misplaced." The prosecutor continued: "You look at the defendant and you'll have to say to him, I know what you are, I know what you've done. And we will not, we cannot, if we're to survive as a society, tolerate this. It cannot be done. It cannot be accepted. You have to say to him very clearly that this was way over the line. And that if you have anything to say about it at all, he will never be put in a position where he will be able to do this again." At that point, defendant's counsel objected again, asserting the argument was improper. The court indicated the objection was noted and the prosecutor resumed, asking the jury "to consider the courage of the witnesses that have come forward and talked about what has happened to them, what they have seen, what they have done . . . . And if they had the courage to put their faith and their trust in this system, I'm asking you to . . . look at your hearts and come back and say, justice demands this. We know what justice demands, and justice demands nothing less than the ultimate penalty [for] this defendant. Justice demands the death penalty."

We reject defendant's claim that these remarks constituted an emotional plea to the jury to assume personal responsibility for the safety of the prosecution's witnesses by returning a death verdict. Rather, the point of the prosecutor's argument was that a system in which witnesses are killed or threatened with death cannot function and, therefore, the death penalty is required to deter people like defendant from killing witnesses and compromising the

60

integrity of the system. A prosecutor is entitled to "assert that the community, acting on behalf of those injured, has the right to express its values by imposing the severest punishment for the most aggravated crimes," so long as those comments are "not inflammatory," do not "seek to invoke untethered passions," and do not "form the principal basis of his argument." (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1179.) Moreover, to the extent the argument was a comment on defendant's future dangerousness, such argument was permissible. " '[I]n closing argument a prosecutor may . . . comment on the possibility that if the defendant is not executed he or she will remain a danger to others. . . . [if] . . . such comments . . . are supported by the evidence.' " (*People v. Michaels* (2002) 28 Cal.4th 486, 540-541.) The argument was proper in this case based on the evidence that defendant had engineered Mindy's murder while he was in custody. We find no misconduct.

### b. *Preserving the rule of law*

We likewise reject defendant's related claim that the prosecutor's argument regarding the propriety of the death penalty for witness killing was necessary to preserve the rule of law. Defendant asserts that the prosecutor's argument suggested to the jury that witness killing required the death penalty in every case notwithstanding the existence of the alternative of life without possibility of parole. It is true the prosecutor argued that killing a witness warrants the death penalty because such an act strikes at the heart of the justice system. That argument was not improper. (*People v. Zambrano, supra,* 41 Cal.4th at p. 1179.) The defense could and did offer a different view. The jury was free to come to its own conclusion about which punishment was appropriate. Nor do we agree with defendant that the argument improperly appealed to the jurors' emotions because it suggested the death penalty for witness killing was necessary for society's

61

survival.  " ' "Unlike the guilt determination, where appeals to the jury's passions are inappropriate, in making the penalty decision, the jury must make a moral assessment of all the relevant facts as they reflect on its decision.  [Citations.] Emotions must not reign over reason and, on objection, courts should guard against prejudicially emotional argument.  [Citation.]  But emotion need not, indeed, cannot, be entirely excluded from the jury's moral assessment." [Citation.]' " (*People v. Jackson* (2009) 45 Cal.4th 662, 691.)  We conclude that the prosecutor's argument did not constitute prejudicially emotional argument and was not misconduct.

### c. *Comparing life without parole to the victim's family's permanent loss*

Defendant contends finally that the prosecutor committed misconduct when he contrasted the kind of life defendant might enjoy in prison with the impact of Mindy's death on her family, contending that the argument constituted an inflammatory call for vengeance and a misuse of victim impact testimony.  We conclude there was no misconduct.

Over defense objection, the prosecutor asked the jury to consider the meaning of life without the possibility of parole, saying, "I want you to think about when you're a lifer and you're in prison, what are you doing [?]  What can you do?  Can you read?  Can you watch T.V.?  Can you work out?  Can you have friends?  It might be monastic, but do you have a life?  Do you continue to breathe the air that is on the earth?  Do you continue to think?  Do you continue to write to your friends and family?  Do you have visits?  Do you have a life? . . .  On holidays or whatever, can your family come and see you?  [¶]  If Mindy's family wants to visit her, they can't.  If they want to talk to — well, I take that back because they can go to the grave site, and what a bleak and lonely experience that must be, to see the — visit the grave of your child.  And when they talk to her, I

know that they hope and they pray that she's listening and hearing their words, but it's not the same as holding your child or holding your grandkids." The defense objected that the prosecutor's remarks constituted an improper appeal to the jurors' emotions and were also a call for vengeance.

We observe initially that a prosecutor may properly argue that "the community, *acting on behalf of those injured*, has the right to express its values by imposing the severest punishment for the most aggravated crimes." (*People v. Zambrano, supra,* 41 Cal.4th at p. 1179, italics added.) As we also observed in *Zambrano,* "[r]etribution on behalf of the community *is* an important purpose of all society's punishments, including the death penalty. [Citations.]" (*Id.* at p. 1078.) Therefore, a prosecutor may argue for imposition of the death penalty as "a valid form of community retribution or vengeance," (*ibid.*) so long as the argument does not seek to "invoke untethered passions, or to dissuade jurors from making individual decisions . . . ." (*Id.* at p. 1179; accord, *People v. Martinez* (2010) 47 Cal.4th 911, 966.)

Moreover, with respect to the use of victim impact evidence, a prosecutor does not commit misconduct in closing argument when he or she refers to such evidence to "urge the jurors to rely on it in voting to impose the death penalty." (*People v. Brown* (2004) 33 Cal.4th 382, 400.) In this case the prosecutor's allusions to the impact of Mindy's death on her family, including his reference to the family's graveside visits, were based on properly admitted victim impact evidence.

In light of these principles, we conclude that the prosecutor did not commit misconduct when he called for imposition of the death penalty on defendant, rather than life in prison, because of the permanent loss his murder of Mindy had inflicted on her family. Nor do we find that the prosecutor's argument sought to invoke the jury's "untethered passions" or "dissuade jurors from making

63

individual decisions." (*People v. Zambrano, supra*, 41 Cal.4th at p. 1179.) The prosecutor did no more than argue from the evidence that justice in this case could be served only by imposition of the death penalty. To do so was not misconduct.

### 2. *Instruction on restraints*

Defendant contends that the trial court committed reversible error by failing to instruct jurors in arriving at their verdict during the penalty phase to disregard the fact that defendant had been restrained in the courtroom. We conclude there was no error or, if error, no prejudice.

The record shows that at one point during the guilt phase trial, defendant and his brother created a ruckus in the courtroom outside the presence of the jury. As a result they were both placed in restraints and belted into their seats. At the time the trial court ordered the restraints, it observed that the restraints would not be visible to the jury "unless the defendants make it so." During the penalty phase, Deputy Sheriff Perez, who had been involved in an altercation with defendant at the county jail, was asked to describe how she had handcuffed him on the day of that incident. She testified: "With the chains in my hand. They're similar — *I don't know what he's wearing now*, but it's a handcuff on each end and it — it's got a chain, and I was holding him like this." There was no defense objection to this testimony.

Defendant now contends that in light of the deputy sheriff's testimony, the trial court should have instructed the jury on its own motion to disregard the fact that defendant was in restraints. In support of this claim he relies on *People v. Duran* (1976) 16 Cal.3d 282 (*Duran*). Under *Duran*, "[i]n those instances when visible restraints must be imposed the court shall instruct the jury *sua sponte* that such restraints should have no bearing on the determination of the defendant's guilt. However, when the restraints are concealed from the jury's view, this

64

instruction should not be given unless requested by defendant since it might invite initial attention to the restraints and thus create prejudice which would otherwise be avoided." (*Id.* at pp. 291-292.) Here, defendant points to nothing in the record suggesting that the restraints were visible to the jury. In the absence of evidence the jury saw defendant's restraints, the court had no duty to instruct. (*People v. Lightsey* (2012) 54 Cal.4th 668, 721.)

Defendant cites no authority for the proposition that a witness's fleeting and ambiguous reference to the possibility a defendant might be in restraints triggers the same duty to instruct. Indeed, the Attorney General contends that "there is [*sic*] no indications that the restraints were visible to the jury." This assertion is supported by the trial court's observation when it ordered the restraints that unless the defendants "make it so," the restraints would not be visible to the jury. It is not even clear from the record whether Deputy Sheriff Perez actually saw defendant's restraints (and if she did, when she did) or whether she simply assumed he was restrained. In these circumstances, an instruction may have achieved the opposite result than was intended by *Duran* by calling attention to defendant's restraints when, otherwise, the jury would have been unaware of them.

Even were we to conclude that the witness's passing mention of restraints triggered the court's duty to instruct, any error was harmless. The purpose of requiring the instruction is to prevent the jury from inferring that, because a defendant charged with a violent crime is restrained, he is "a violent person disposed to commit" the charged crime. (*Duran, supra*, 16 Cal.3d at p. 290.) Where, however, as here, a defendant has been convicted of a special circumstance murder, the rationale requiring a sua sponte instruction is no longer applicable. (*People v. Medina* (1990) 51 Cal.3d 870, 898 ["the risk of substantial prejudice to a shackled defendant is diminished once his guilt has been determined"].) As we observed in similar circumstances in *People v. Slaughter*

65

(2002) 27 Cal.4th 1187: "In the present case, the . . . penalty phase jury knew that defendant already had been found guilty of murdering two individuals during the commission of a robbery. Under any standard, it does not appear that the jury's penalty phase verdict would have been affected even if the jurors . . . concluded [the defendant] was wearing a restraint." (*Id.* at p. 1214.) For the same reasons, any error here was harmless.

### 3. *Instruction regarding guilt phase instructions*

Defendant contends reversal is required because the trial court instructed the jury to disregard all guilt phase instructions in the penalty phase of the trial. (CALJIC No. 8.84.1.) Defendant argues that because the court's penalty phase instructions did not include a definition of "reasonable doubt," the jury would not know it was required to apply that standard of proof in deciding whether it could consider as a factor in aggravation the prosecution's evidence that defendant had committed a battery while in custody. He further asserts that the instruction to disregard guilt phase instructions left the jury without standards by which to assess the credibility of witnesses or evaluate whether defendant's statements constituted confessions or admissions. We conclude that the trial court's failure to define "reasonable doubt" and reinstruct on the assessment of witness credibility and confessions and admissions was error but that defendant was not prejudiced.

The penalty phase trial lasted only one day. Defendant elected not to present a case in mitigation. The prosecution's case in aggravation consisted of victim impact testimony and the testimony of two sheriff's deputies regarding an incident in which defendant reacted violently when being moved from the jail infirmary to a disciplinary building.

Notably, the jury was instructed that before it could consider the jail incident as a factor in aggravation it had to find beyond a reasonable doubt that

66

defendant committed the act. The court did not, however, provide a definition of "reasonable doubt." The court's failure to reiterate the definition of "reasonable doubt" at the penalty phase was error. (*People v. Cowan* (2010) 50 Cal.4th 401, 494; *People v. Chatman* (2006) 38 Cal.4th 344, 408.) And yet "its failure to do so was harmless. 'Absent any suggestion to the contrary, the jury would likely have assumed the reasonable doubt the court referred to at the penalty phase had the same meaning as the term had during the guilt phase. There is no reasonable likelihood [citation] the jury would have believed the reasonable doubt analysis it was required to engage in at the penalty phase was somehow different than the reasonable doubt analysis it had already engaged in at the guilt phase. That the court would not have changed the meaning of such an important term without saying so is a "commonsense understanding of the instructions in the light of all that has taken place at the trial [that is] likely to prevail over technical hairsplitting." [Citation.] Additionally, "the jury did not request a further explanation of the reasonable doubt standard, as it surely would have done had it been confused as to the meaning of reasonable doubt." [Citation.]' [Citation.]" (*People v. Loker* (2008) 44 Cal.4th 691, 745-746; accord, *People v. Cowan, supra,* at pp. 494-495; *People v. Lewis* (2008) 43 Cal.4th 415, 534-535.) This analysis applies with equal force to the present case. The trial court's failure to reinstruct the jury with the previously given definition of "reasonable doubt" was harmless.

The court's failure to reinstruct the jury regarding how to assess witness credibility or how to determine whether defendant's statements were confessions or admissions is likewise error. (*People v. Moon* (2005) 37 Cal.4th 1, 37.) In assessing prejudice from the omission of such instructions at the penalty phase, we evaluate " 'the nature of the evidence presented to determine whether it was likely the omitted instructions affected the jury's evaluation of the evidence,' " and where we have found the "evidence presented by both the prosecutor and the

67

defendant at the penalty phase" to be "relatively straightforward," we have concluded "defendant was not prejudiced by the omission of the instructions. [Citation.]" (*People v. Souza* (2012) 54 Cal.4th 90, 134.)

Here, the penalty phase evidence was relatively brief and quite straightforward. The only evidence that the defense might have controverted, and as to which the credibility and admissions and confessions instructions might have applied, was the testimony of the two sheriff's deputies regarding defendant's in-custody altercation. Significantly, however, defense counsel's brief cross-examination of these witnesses did not question whether the altercation had occurred as they described it. Rather, counsel's approach was to minimize the incident. For example, he asked one witness about the extent of her injuries and whether she had to take off any time from work. Counsel pursued this strategy in his closing argument in which he referred briefly to the altercation and characterized it as a "relatively minor incident," and suggested that it should be considered a factor in mitigation because it was the sole incident "in over a two-year period that [defendant] has been incarcerated."

On this record, we conclude that the court's failure to redefine reasonable doubt and reinstruct on the evaluation of witness credibility and confessions and admissions by the defendant at the penalty phase did not prejudice defendant.

### G. Challenges to the Death Penalty Statute

Defendant advances a number of challenges to the death penalty statute and related procedures. We have repeatedly rejected each in the past and we do so again, concluding:

"California's automatic appeals procedure is not unconstitutional on the ground that it fails to provide for intercase proportionality review." (*People v. Myles* (2012) 53 Cal.4th 1181, 1224.)

68

"The California death penalty scheme is not constitutionally defective because it fails to require jury unanimity on the existence of aggravating factors, or because it fails to require proof beyond a reasonable doubt that death is the appropriate penalty, that aggravating factors exist, or that aggravating factors outweigh mitigating factors. [Citation.] The United States Supreme Court's decisions interpreting the right to a jury trial under the federal Constitution (see *Blakely v. Washington* (2004) 542 U.S. 296; *Ring v. Arizona* (2002) 536 U.S. 584) do not change these conclusions." (*People v. Thomas* (2012) 53 Cal.4th 771, 835.)

"We repeatedly have held that the standard version of CALJIC No. 8.88 [defining aggravating and mitigating factors and the scope of the jury's sentencing discretion] is adequate and correct. [Citations.] We decline to reconsider that issue here." (*People v. Souza, supra,* 54 Cal.4th at p. 141.) Specifically, we reject defendant's claims that CALJIC No. 8.88 is unconstitutional because (a) the instruction's use of the phrase "so substantial" is so vague as to violate the Eighth and Fourteenth Amendments to the federal Constitution; (b) because the instruction unconstitutionally fails to require the jury to decide not only whether death is an authorized punishment, but also whether it is the appropriate punishment; (c) the instruction fails to inform the jury that if it determines that the factors in mitigation outweigh those in aggravation, it must return a sentence of life without the possibility of parole; and (d) the instruction fails to inform jurors that defendant does not have the burden of persuasion that death is not the appropriate penalty. (*People v. Boyette* (2002) 29 Cal.4th 381, 464-465; *People v. Gurule* (2002) 28 Cal.4th 557, 661-662.)

Moreover, "[s]ection 190.3, factor (a), does not violate the federal Constitution's Fifth, Sixth, Eighth, and Fourteenth Amendments by its asserted application in a ' "wanton and freakish" ' manner that allows almost all features of

every murder, even features ' "at odds," ' to be characterized as aggravating."
(*People v. Clark, supra,* 52 Cal.4th at p. 1007.)

" 'The statutes are not invalid because they permit the jury to consider in aggravation, under section 190.3, factor (b), evidence of a defendant's unadjudicated offenses.  [Citation.]' " (*People v. Fuiava* (2012) 53 Cal.4th 622, 732.)  Moreover, the jury "need not make a unanimous finding on factor (b) evidence." (*People v. Brown, supra,* 33 Cal.4th at p. 402.)

The trial court need not omit assertedly inapplicable sentencing factors. (*People v. Fuiava, supra,* 53 Cal.4th at p. 733.)  Neither does the inclusion of terms such as " ' " 'extreme' " ' " and " ' " 'substantial' " ' " in the list of potential mitigating factors read to the jury " ' "impermissibly limit the mitigation evidence or otherwise result in an arbitrary or capricious penalty determination." ' " (*Id.* at p. 732.)  Nor is the statute invalid because the jury is not required to make written findings regarding the aggravating factors.  (*Ibid.*)  Finally, " ' "[t]here is no violation of the equal protection of the laws as a result of the statutes' asserted failure to provide for capital defendants some procedural guarantees afforded to noncapital defendants." ' " (*Ibid.*; accord, *People v. Souza, supra,* 54 Cal.4th at p. 142.)

### H.  International Law

Defendant contends that his death sentence violates international law, covenants, treaties and norms that are binding on the United States.  "We reject the assertion.  'Because defendant has failed to establish prejudicial violations of state or federal constitutional law, we need not consider whether such violations would also violate international law.'  [Citations.]" (*People v. Myles, supra,* 53 Cal.4th at p. 1225.)

70

## I. Cumulative Effect of Asserted Errors

Defendant maintains that the cumulative impact of the asserted errors at the guilt and penalty phases rendered his trial fundamentally unfair. We have found no error except as to defendant's claim that the trial court erroneously admitted evidence of Ricardo's state of mind during the guilt phase and the trial court's failure to reinstruct the jury on the definition of reasonable doubt and on witness credibility, confessions, and admissions during the penalty phase (see *ante*, pts. II.B.2., II.F.3). In addition, we have assumed without deciding that the court erred by allowing testimony about Mindy's demeanor during her testimony at the preliminary hearing at the guilt phase and by failing to instruct the jury on restraints at the penalty phase. (See *ante,* pts. II.B.5., II.F.2.) Our findings of error and our assumptions of error were accompanied by findings that defendant was not prejudiced. We also conclude defendant was not cumulatively prejudiced.

## CONCLUSION

We affirm the judgment in its entirety.

CANTIL-SAKAUYE, C. J.

WE CONCUR:

KENNARD, J.
BAXTER, J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.
LIU, J.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Lopez

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S073597
**Date Filed:** June 13, 2013

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Meredith C. Taylor

_____

**Counsel:**

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, and Arnold Erickson, Deputy State Public Defender, for Defendant and Appellant.

Bill Lockyer and Kamala D. Harris, Attorneys General, Robert R. Anderson, Chief Assistant Attorney, Pamela C. Hamanaka, Assistant Attorney General, John R. Gorey and Theresa A. Patterson, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Arnold Erickson
Deputy State Public Defender
221 Main Street, 10th Floor
San Francisco, CA  94105
(415) 904-5600

Theresa A. Patterson
Deputy Attorney General
300 South Spring Street
Los Angeles, CA  90013
(213) 620-6004