Filed 4/8/16  P. v. Galvan CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JESSE CALDELARI GALVAN,<br><br>    Defendant and Appellant. | B259576<br><br>(Los Angeles County<br>Super. Ct. No. BA390560) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Gail Ruderman Feuer, Judge.  Modified and affirmed with directions.

Matthew Alger, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Margaret E. Maxwell, Supervising Deputy Attorney General, and Thomas C. Hsieh, Deputy Attorney General, for Plaintiff and Respondent.

_____

Jesse Candelari Galvan appeals from the judgment entered following a jury trial in which he was convicted of first degree murder (Pen. Code, § 187, subd. (a)) with an attempted robbery special circumstance allegation (§ 190.2, subd. (a)(17)), and attempted second degree robbery (§§ 664/211).[1] The trial court sentenced appellant to 25 years to life in state prison for the murder conviction, and stayed punishment pursuant to section 654 on the conviction for attempted robbery.

Appellant contends (1) the trial court committed prejudicial error when it admitted the statements that appellant's brother made in their recorded telephone conversation; and (2) the trial court committed prejudicial error when it refused to admit appellant's pay stub into evidence. We disagree. However, as respondent concedes, because the sentence for appellant's attempted robbery conviction was stayed pursuant to section 654, the trial court erred when it imposed restitution and parole revocation fines for that count. We further agree with respondent's contention that the trial court should have imposed the mandatory fees and assessments as to the stayed count. We therefore modify the judgment accordingly and affirm.

## FACTUAL BACKGROUND

On December 21, 2009, Fereidoun Kohanim[2] and his wife visited their sons, Sami and Ramin Kohanim, at the family's 98 Cents Store on Venice Boulevard. Around 4:00 p.m. Sami left his father to watch the cash register while Sami used the rest room and went to the back office. Hearing a loud noise, Sami ran to the front of the store where he found his father lying on the floor. A man was running out of the store.

Fereidoun died of a single gunshot wound to the back of his head. A damaged .38-caliber bullet was recovered from Fereidoun's body.

A surveillance video showed three men enter the store. One of the men wore a black beanie, a gray long sleeve shirt, and a towel covering his neck. There was a light

---

[1] Undesignated statutory references are to the Penal Code.

[2] Members of the same family are referred to by first name to avoid confusion.

spot, which could have been a small bandage, on his left cheek. As this person held open a bag and said something to Fereidoun, one of the other men pointed what appeared to be a chrome revolver at Fereidoun, who was standing behind the counter. The gunman then pointed the gun at Fereidoun's wife and back at Fereidoun, who tried to slap the gun away. The third man walked around the counter and Fereidoun moved toward him. The gunman then shot Fereidoun in the back of the head.

Several still photographs were taken from the surveillance video. These photos were shown to a Baldwin Park police officer who identified appellant as the suspect with a towel around his neck wearing the black beanie and gray long sleeve shirt. The officer stated that a bandage appeared to be covering a tattoo on appellant's face, and appellant had tattoos on his head and neck that were covered by the beanie and towel.

On July 7, 2010, police searched a home in Baldwin Park where appellant and his girlfriend were living in a converted garage. Police recovered a bluish-black beanie similar to the one worn by one of the men in the video. In a closet in the garage police also found a blue steel[3] ".38 Special" revolver loaded with six rounds. Police found three more .38 Special rounds with three other bullets in a paper bag, and 24 rounds of .38 Special cartridges on a shelf. It could not be conclusively determined whether the .38 Special revolver recovered in the search was the murder weapon.

Appellant's girlfriend, Karina Lopez, started dating appellant in July or August 2009, and moved into the garage with her baby[4] in November or December 2009. During an interview on the day of the search of appellant's home, Lopez was shown a three- or four-second clip of the video in which the individual in the gray sweatshirt can be seen walking into the store. Asked, "So who's that?" Lopez responded, "It's obvious. That's Jesse. So what?" Viewing the entire video during trial Lopez again identified

---

[3] The revolver seen in the video appeared to be chrome, not blue steel, but Officer Cortina, who was present during the search and had seen the video, explained the difference in appearance could have been due to lighting conditions.

[4] Lopez also had another child with appellant.

appellant as the suspect wearing the gray sweatshirt, explaining that she recognized the man with whom she had lived by the way he would stand and move, particularly when he was upset or angry. Lopez also confirmed that appellant has a tattoo on his upper left cheek where there appears to be a bandage in the video, and tattoos on his neck and head.

In December 2009, Lopez noticed appellant would change the television channel whenever news of the attempted robbery and murder in this case was broadcast. Lopez also overheard appellant talking about the crime with his mother. Both appellant and his mother were crying, and appellant said he was sorry. After appellant's arrest, Lopez received threats from appellant's aunt and another member of appellant's family.

Appellant worked part-time at Homeboy Industries as a janitor. He testified that in December 2009, his schedule was from 12:00 p.m. until 3:30 or 4:00 p.m., and his pay stub for the period between December 13 and 26, 2009 reflected payment for 26.5 hours of work. As appellant did not have a driver's license, his mother, Norma Galvan, drove him to work or dropped him off at the metro station every day on her way to her job at the CVS store on 103rd and Compton.

Appellant gave his probation officer the phone number 323-503-9574. On November 16, 2009, February 12, 2010, and April 22, 2010, appellant gave three different police officers with whom he had come in contact the same phone number. Appellant testified that he did not have a working cell phone, and the number he gave to his probation officer and police belonged to his mother. Gladys Macias, appellant's aunt, testified that she had an extra line on her phone plan which she had given to appellant's mother, Norma. The number on that line was 323-503-9574. Whenever Macias called that number, Norma answered. Norma testified that she always carried that cell phone on her person, and never lent it to anyone, including her son.

Cell phone records showed the phone associated with 323-503-9574 was used at approximately 4:11 p.m. near the crime scene on December 21, 2009.[5]

---

[5] According to a defense expert, the 4:11 p.m. call "pinged" off a cell tower near the 10 and 110 freeways that was pointed in a southeast direction, which meant that the

4

Norma's CVS time card report showed that she worked from 9:30 a.m. to 6:00 p.m. on December 21, 2009. But according to the defense expert, her phone was used nowhere near the CVS store, but close to Home Boy Industries from 12:43 p.m. to 2:05 p.m. and again between 4:19 p.m. and 4:26 p.m. on that day.[6] Norma explained that her husband was unemployed at the time, and it was possible that he was using her phone on December 21, 2009.

## DISCUSSION

I. **The Trial Court's Admission of the Statements Made by Appellant's Brother During Their Recorded Telephone Conversation Does Not Warrant Reversal**

A. *Relevant Background*

After his arrest appellant made a phone call to his brother Joey Galvan from the police station phone.[7] The brothers' telephone call was recorded, and the transcript admitted at trial reflects the following conversation:

"[Joey]      They only got, they only got you?

"[Appellant]  Yeah. I think, I don't know. I'm looking and shit but—"

"[Joey]      You know, don't, don't worry you you just you know you don't know what the hell is going on you know.

---

phone could not have been on the side of the freeway where the 98 Cents Store was located. On cross-examination, the prosecution sought to establish that the witness had miscalculated the possible positions of a cell phone pinging off that six-sector tower by treating it as a three-sector tower and using 120 degrees for each sector instead of 60 degrees for each sector as appropriate for a six-sector tower.

[6] Claiming that Home Boy Industries "is located approximately three blocks from the 98 Cent Store," appellant seems to suggest that the precise location of the calls in the afternoon of December 21, 2009, could not be pinpointed to either Home Boy Industries or the 98 Cents Store because calls from either location could have pinged the same cell towers. However, the record is devoid of any evidentiary support for appellant's assertion that the two sites are a mere three blocks apart.

[7] Appellant does not challenge the propriety of the police recording of his jailhouse phone call.

"[Appellant]  Yeah, I know.  I, I've been thinking about it—

"[Joey]        But don't know you know, don't don't worry everything is gonna be okay just you know be strong okay?

"[Appellant]  Yeah"

"[Appellant]  —tell everybody, tell everybody that when I talk to them—

"[Joey]        mhm

"[Appellant]  —talk to me alright, you know.

"[Joey]        Wait what?

"[Appellant]  Like when you talk to people and they wanna talk like cause ima fall people you know cause I'm pretty sure ima get some phone calls and shit just tell them."

"[Joey]        Did they ask you about me?

"[Appellant]  No.

"[Joey]        No questions about me?

"[Appellant]  No, just tell them not to talk to me all regular and shit."

"[Joey]        What about fucking Karina?

"[Appellant]  Well I don't know."

Appellant sought to exclude the recording on hearsay and confrontation clause grounds.  The trial court ruled that appellant's statements during the call were admissible as admissions (Evid. Code, § 1220), and Joey's part of the conversation consisted of questions offered not for their truth but to give context to appellant's statements in response.  As such, Joey's statements were not hearsay.

In closing argument to the jury, the prosecutor replayed the recording of the jailhouse conversation, and argued that the only reasonable inference from Joey's questions, "They only got you?" and "Did they ask you about me?" was that Joey and appellant were discussing the robbery and murder they had committed together at the 98 Cents Store.  Addressing appellant's suggestion that Joey's question, "What about fucking Karina?" was merely an expression of concern for Karina, the prosecutor also argued that the brothers' tone indicated not a concern for Karina's welfare, but for what she knew about the crime.

6

**B.** *Joey's Statements Were Not Testimonial*

Appellant contends the admission of his brother's end of the conversation from the recorded phone call with appellant violated appellant's Sixth Amendment right to confrontation. Characterizing Joey's statements as testimonial hearsay by a declarant who was unavailable for cross-examination, appellant maintains the recording should have been excluded under *Crawford v. Washington* (2004) 541 U.S. 36, 59 (*Crawford*). The claim is without merit.

"The Sixth Amendment's Confrontation Clause provides that, '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.'" (*Crawford*, *supra*, 541 U.S. at p. 42.) "[T]his provision bars 'admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.'" (*Davis v. Washington* (2006) 547 U.S. 813, 821 (*Davis*); *Williams v. Illinois* (2012) __ U.S. __, __ [132 S.Ct. 2221, 2232].)

The crucial determination under *Crawford* is whether the out-of-court statement is testimonial or nontestimonial. Although the Supreme Court did not give a comprehensive definition of "testimonial," it reasoned the express reference in the confrontation clause to "'witnesses'" reflects its focus on those who "'bear testimony,'" which typically is "'[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" (*Crawford*, *supra,* 541 U.S. at p. 51.) The high court identified a "core class" of testimonial statements, including "'*ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially,'" as well as "'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" (*Id*. at pp. 51–52.) Finally, *Crawford* specified that whatever else the term "testimonial" covers, "it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations" as clear

examples of testimonial statements. (*Id.* at p. 68.) The Supreme Court subsequently explained that a statement is testimonial "when the circumstances objectively indicate that there is no . . . ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Davis*, *supra*, 547 U.S. at p. 822.)

In *People v. Cage* (2007) 40 Cal.4th 965, 984, our Supreme Court identified several key features of a testimonial statement: "First, . . . the confrontation clause is concerned solely with hearsay statements that are testimonial, in that they are out-of-court analogs, in purpose and form, of the testimony given by witnesses at trial. Second, though a statement need not be sworn under oath to be testimonial, it must have occurred under circumstances that imparted, to some degree, the formality and solemnity characteristic of testimony. Third, the statement must have been given and taken *primarily* for the *purpose* ascribed to testimony—to establish or prove some past fact for possible use in a criminal trial. Fourth, the primary purpose for which a statement was given and taken is to be determined 'objectively,' considering all the circumstances that might reasonably bear on the intent of the participants in the conversation. Fifth, sufficient formality and solemnity are present when, in a nonemergency situation, one responds to questioning by law enforcement officials, where deliberate falsehoods might be criminal offenses. Sixth, statements elicited by law enforcement officials are not testimonial if the primary purpose in giving and receiving them is to deal with a contemporaneous emergency, rather than to produce evidence about past events for possible use at a criminal trial." (Fns. omitted.)

Joey's side of the conversation here bears none of these characteristics. As statements made in the course of a telephone call between Joey and his brother, they were in no way the functional equivalent of in-court testimony, completely lacking any degree of formality and solemnity that would accompany such testimony. Moreover, even though police surreptitiously recorded the brothers' informal conversation, Joey did not make these statements to law enforcement, nor is there any indication that Joey believed the call was being recorded or could be used in a criminal trial. Indeed, it is settled that

8

such "'informal statement[s] to a person not affiliated with law enforcement,' fall outside the scope of the confrontation clause, which is concerned with 'formal and solemn accusatory statements . . . in the context of criminal investigations or inquiries.' [Citations.]" (*People v. Lopez* (2013) 56 Cal.4th 1028, 1065–1066, disapproved on another ground in *People v. Rangel* (2016) __ Cal.4th __ [2016 Lexis 1816]; *People v. Maciel* (2013) 57 Cal.4th 482, 527 [statements made to fellow gang members not testimonial]; *People v. Arauz* (2012) 210 Cal.App.4th 1394, 1401–1402 [inmate's "statements unwittingly made to an informant are not 'testimonial' within the meaning of the confrontation clause"].)

Accordingly, because Joey's statements cannot be deemed "testimonial," there was no Sixth Amendment confrontation clause violation in admitting them.

## C. *Any Error in Admitting the Statements Was Harmless*

Appellant contends that Joey's questions during the phone call with his brother contained implied statements that were admitted for their truth. Appellant thus asserts that the trial court abused its discretion in admitting Joey's side of the conversation because Joey's questions constituted inadmissible hearsay not subject to any exception. While we agree that Joey's questions provided relevant context to appellant's responses only if the implied statements contained in those questions were true, appellant's failure to demonstrate prejudice resulting from the admission of Joey's statements requires us to reject his claim.

We apply the harmless error analysis under *People v. Watson* (1956) 46 Cal.2d 818, 836, to evaluate a trial court's erroneous admission of hearsay evidence. (*People v. Duarte* (2000) 24 Cal.4th 603, 618–619.) Under that standard, the admission of Joey's statements must be considered harmless in light of the abundant evidence of appellant's guilt. Appellant's live-in girlfriend unequivocally identified appellant as one of the suspects in the surveillance video from the robbery. A police officer who had had three to five encounters with appellant also identified appellant from a still photograph taken from the video. Cell phone records showed that the phone associated with the number

9

appellant had given his probation officer and three police officers on different occasions was in the vicinity of the 98 Cents Store immediately after the murder.

Given this overwhelming evidence of appellant's guilt, we find no reasonable probability that the result would have been more favorable to appellant in the absence of the alleged error. (*People v. Watson*, *supra*, 46 Cal.2d at p. 836.)

## II. The Trial Court Properly Refused to Admit Appellant's Pay Stub Into Evidence

Appellant contends that the trial court erred in excluding as hearsay his pay stub from Home Boy Industries. We disagree.

Appellant acknowledges that the pay stub was inadmissible as a business record to independently show that appellant had worked during the period from December 13 through December 26, 2009. But appellant maintains that the pay stub was admissible "to corroborate appellant's testimony that he had been working around 'Christmas time' 2009." He further asserts that because the pay stub showed that appellant worked 26.5 hours during this period, it corroborated his testimony "that he usually worked from 12:00 p.m. to approximately 4:00 p.m."[8]

In support of his argument, appellant cites a judicially created exception to the hearsay rule for documents such as invoices, bills and receipts that have been received by a witness for a repair or indebtedness which are admissible for the limited purpose of corroborating the witness's testimony. (*Pacific Gas & E. Co. v. G. W. Thomas Drayage etc Co.* (1968) 69 Cal.2d 33, 42 (*P.G. & E.*).) In *P.G. & E.*, the plaintiff sought to prove the amount of damages sustained by presenting the invoices by which it had remitted payment together with testimony that payment had been made. The court held that such documents were admissible under a limited exception to the hearsay rule, declaring that "[s]ince invoices, bills, and receipts for repairs are hearsay, they are inadmissible independently to prove that liability for the repairs was incurred, that payment was made,

---

[8] In fact, appellant testified that he generally worked in the morning from 8:00 a.m. to 12:00 or 1:00 p.m., or in the afternoon from 12:00 to 3:30 or 4:00 p.m.

or that the charges were reasonable. [Citations.] If, however, a party testifies that he incurred or discharged a liability for repairs, any of these documents may be admitted for the limited purpose of corroborating his testimony [citations], and if the charges were paid, the testimony and documents are evidence that the charges were reasonable. [Citations.]" *P.G. & E.*, *supra*, 69 Cal.2d at pp. 42–43.) The court, however, specified that this exception does not extend to the admission of individual items on the invoices to prove that specific repairs actually were made, unless a witness were called to testify that the invoices accurately reported the repair work. (*Id.* at p. 43.)

Appellant maintains that this limited hearsay exception *should* apply to "pay stubs that have been received by a witness for wages that he . . . earned." But appellant's pay stub from Home Boy Industries shows only that appellant worked 26.5 hours during the period from December 13 through December 26; it contains no indication of what specific days or what hours appellant worked during that period. And appellant fails to explain how a document that contains no indication of the specific hours appellant worked corroborates his testimony that he worked specific hours on a particular day. Accordingly, we find no abuse of discretion in the trial court's ruling that the pay stub was inadmissible under the business records exception to the hearsay rule, nor did the court err in failing to admit the document for the limited purpose of corroborating appellant's testimony. (*People v. Jones* (1998) 17 Cal.4th 279, 308.)

## III. The Trial Court Erred in Imposing Restitution and Parole Revocation Fines on the Stayed Count and in Failing to Impose Other Mandatory Fees and Assessments on that Count

Appellant contends that because the sentence on count 2 was stayed pursuant to section 654, the trial court improperly imposed both restitution and parole revocation fines on that count. Respondent concedes that restitution and parole revocation fines were improper as to count 2, but contends that the trial court should have imposed an additional mandatory fee and assessment as to that count. We agree.

The trial court stayed punishment on count 2 pursuant to section 654, but imposed a $200 restitution fine (§ 1202.4, subd. (b)) and a $200 parole revocation fine (§ 1202.45)

11

as to both counts 1 and 2.  Restitution fines and parole revocation fines may not be imposed on counts as to which sentence has been stayed.  (*People v. Sencion* (2012) 211 Cal.App.4th 480, 482; *People v. Carlson* (2011) 200 Cal.App.4th 695, 710.)  The trial court erred in imposing restitution and parole revocation fines on count 2.  Although the imposition of the restitution and parole revocation fines on the stayed count was error, the abstract of judgment correctly reflects the imposition of a restitution fine and parole revocation fine only as to count 1.  Accordingly, only the minute order of the sentencing proceedings requires correction to reflect imposition of one restitution fine and one parole revocation fine.

The trial court failed to impose a $40 court security fee (Pen. Code, § 1465.8, subd. (a)(1)) or a $30 court facilities assessment (Gov. Code, § 70373, subd. (a)(1)) as to count 2.  These fees and assessments are mandatory, and apply to each count of conviction even if the conviction is stayed under Penal Code section 654.  (*People v. Sencion*, *supra*, 211 Cal.App.4th at pp. 483–484; *People v. Castillo* (2010) 182 Cal.App.4th 1410, 1415, fn. 3 [Gov. Code, § 70373, subd. (a)(1)]; *People v. Schoeb* (2005) 132 Cal.App.4th 861, 865–866 [Pen. Code, § 1465.8, subd. (a)(1)].)  The minute order and the abstract of judgment must therefore be corrected to include these fees and assessments.

## DISPOSITION

The judgment is modified to reflect imposition of one $200 restitution fine (Pen. Code, § 1202.4, subd. (b)), and one $200 parole revocation fine (Pen. Code, § 1202.45) as to count 1 only.  The judgment is further modified to impose a $40 court security fee (Pen. Code, § 1465.8, subd. (a)(1)) and a $30 court facilities assessment (Gov. Code, § 70373, subd. (a)) as to count 2.  The trial court is ordered to correct the minute order and to prepare and forward to the Department of Correction and Rehabilitation an amended abstract of judgment to reflect these modifications.  In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED.

LUI, J.

We concur:

ROTHSCHILD, P. J.

CHANEY, J.

13